2014 UT App 40

**Jonna M. (Shannon) LAWRENCE, Plaintiff and Appellant,**

v.

**MOUNTAINSTAR HEALTHCARE, Northern Utah Healthcare Corporation, and St. Mark's Hospital, Defendants and Appellees.**

No. 20120352–CA.

Court of Appeals of Utah.

Feb. 21, 2014.

1038 

Lynn C. Harris, D. David Lambert, Leslie W. Slaugh, and Richard A. Roberts, Provo, for Appellant.

Eric P. Schoonveld, Tawni J. Anderson, Salt Lake City, and Shelley M. Doi–Taketa, for Appellees.

Judge CAROLYN B. McHUGH authored this Opinion, in which Judges J. FREDERIC VOROS JR. and STEPHEN L. ROTH concurred.

## Opinion

McHUGH, Judge:

¶ 1 Jonna M. (Shannon) Lawrence[1] appeals from a jury verdict in favor of MountainStar Healthcare, Northern Utah Healthcare Corporation, and St. Mark's Hospital (collectively, Hospital). We affirm.

## BACKGROUND[2]

¶ 2 Shannon went to the emergency room at St. Mark's Hospital on January 22, 2007, seeking treatment for an allergic reaction to Tylenol 3, a common painkiller that she had taken following dental work earlier that day. Dr. Paradise treated Shannon in the emergency room and prescribed several medi-

---

1. Appellant's last name changed from Shannon to Lawrence after the incident that gave rise to this suit but before the suit was filed. Because counsel and witnesses referred to her at trial by the name of Shannon, we do the same.

2. "On appeal from a jury verdict, we view the evidence and all reasonable inferences drawn therefrom in the light most favorable to that verdict." *Water & Energy Sys. Tech., Inc. v. Keil,* 2002 UT 32, ¶ 2, 48 P.3d 888 (citation and internal quotation marks omitted). "We present conflicting evidence only to the extent necessary to understand the issues raised on appeal." *Ortiz v. Geneva Rock Prods., Inc.,* 939 P.2d 1213, 1215 (Utah Ct.App.1997) (citation and internal quotation marks omitted).

cations. The first, epinephrine, was to be administered subcutaneously, i.e., under the skin, and the two others were to be administered intravenously, i.e., through the vein. Contrary to Dr. Paradise's orders, a nurse (Nurse) administered all of the medications intravenously. Shannon's friend (Friend), who was present at the time, testified [3] that immediately after Nurse administered the epinephrine intravenously, Shannon cried out in pain and her back arched up off the bed.[4] Friend also saw Shannon vomit once or twice. According to Nurse, Shannon sat up, put her hands on her chest, said that her heart was palpitating, and became pale, nauseous, and anxious. Nurse realized her mistake when she noticed the side effects of epinephrine happen faster than expected. After Nurse alerted a physician, Shannon was transferred to the intensive care unit (ICU) where she received further medical attention. Meanwhile, Nurse's shift ended as scheduled, and she completed risk management paperwork related to the incident before leaving the hospital.

¶ 3 Later that day, Dr. Paradise spoke with Shannon about the erroneous administration of the epinephrine and explained that she needed to stay in the hospital for observation. Hospital administrators and risk managers who met with Shannon and her family during her hospitalization also acknowledged that an error had been made. Shannon contacted her family attorney, who may have been present during some of the conversations. Shannon recuperated enough to be discharged within a week, but she complains of ongoing symptoms and serious medical conditions allegedly caused by the intravenous administration of epinephrine.

¶ 4 After her discharge, Shannon made multiple visits to Hospital's emergency room. On the first visit, the attending physician performed a full assessment but found no physical abnormalities except for mouth sores. During the second visit, Shannon underwent a variety of cardiac and neurologic tests, which all came back negative. After four additional visits, Shannon's physicians still could not discover any physical problems, other than an unrelated kidney infection.

¶ 5 On December 15, 2008, Shannon filed a complaint against Hospital seeking damages under a theory of negligence. In particular, Shannon claimed that the intravenous delivery of the epinephrine caused her to suffer anoxic brain damage,[5] cardiac damage, and thoracic outlet syndrome,[6] as well as headaches, depression, anxiety, cognitive defects, and neck, shoulder, and back pain. Subsequently, Shannon and Hospital reached a stipulation "that the administration of epinephrine to [Shannon] intravenously rather than subcutaneously by [Nurse] on January 22, 2007 was a breach of the applicable standard of care." The parties clarified, however, that "[t]his stipulation does not constitute, and is neither intended, nor should it be construed as, an admission that this breach ... was the direct, proximate, or contributing cause of any damages allegedly sustained by [Shannon], which such causation and damages are denied by [Hospital], both generally and specifically, to exist." The trial court took notice of the joint stipulation and ordered that only the issues of causation and damages would be submitted to the jury for decision.

---

3. A portion of Friend's videotaped deposition was played for the jury in lieu of live testimony.

4. At trial, one of Shannon's expert witnesses described this event as a tetanic contraction. A tetanic contraction is a "sustained muscular contraction without intervals of relaxation." *See Tetanic Contraction,* The Free Dictionary, http://medical-dictionary.thefreedictionary.com/tetanic+contraction (last visited Feb. 18, 2014).

5. "Anoxic brain damage is injury to the brain due to a lack of oxygen." *Anoxic Brain Damage,* Mount Sinai Hospital, http://www.mountsinai.org/patient-care/health-library/diseases-and-conditions/anoxic-brain-damage (last visited Feb. 18, 2014).

6. "Thoracic outlet syndrome is a group of disorders that occur when the blood vessels or nerves in the space between your collarbone and your first rib (thoracic outlet) become compressed. This can cause pain in your shoulders and neck and numbness in your fingers." *Thoracic Outlet Syndrome,* Mayo Clinic (Aug. 1, 2013), http://www.mayoclinic.org/diseases-conditions/thoracic-outlet-syndrome/basics/definition/con-20040509.

¶ 6 Before trial, Hospital filed a motion to exclude references to any statements made by persons associated with Hospital regarding offers to pay medical expenses on the grounds that such information was irrelevant and unfairly prejudicial. Shannon, in turn, moved to admit those and other statements where Hospital allegedly admitted fault, arguing that the statements were admissions by a party opponent that should be permitted into evidence. According to Hospital, the statements Shannon identified were inadmissible as expressions of apology or compassion. The trial court granted Hospital's motion and denied Shannon's, ruling that the statements were irrelevant because "[n]one of [them] are helpful to resolve any of the issues that are remaining in this case," namely "what harm was actually caused by this error."

¶ 7 Shannon also filed a pretrial motion to exclude evidence. Specifically, she moved to exclude any references to her alleged substance abuse that predated the hospitalization, as well as evidence that she had been charged with misdemeanor offenses, which included charges resulting from a July 4, 2011 arrest for driving under the influence (DUI) and possession of drug paraphernalia. At a pretrial hearing, the trial court excluded most of the misdemeanor charges but ruled that the possession of paraphernalia charge "is relevant because it ties into whether or not there is substance abuse as an ongoing issue in [Shannon's] life and whether the substance abuse provides an alternative causation for her symptom[s]." Although the trial court ruled that the drug paraphernalia charge was "fair for the defense to go into," it excluded evidence of Shannon's DUI charge, her failure to pass the field sobriety test, and the arresting officer's observations stemming from the arrest. The parties later stipulated that the jury could be informed of the paraphernalia charge by the following statement, which the trial court read to the jury: "[O]n July 4, 2011 [Shannon] was in possession of a plastic [pen] straw with opiate residue."

¶ 8 During trial, Shannon argued that Nurse's negligence caused the epinephrine to reach her bloodstream too quickly, similar to the effects of a drug overdose, thereby resulting in permanent brain and heart tissue damage. Shannon sought $5.7 million in damages for her injuries. Hospital countered that the "wrong route" delivery of the epinephrine did not cause harm to Shannon and that her lingering medical complaints were due to preexisting conditions. Hospital's counsel read to the jury Shannon's admission that she had suffered from anxiety, hyperventilation, and chest pain since 1995; from neck and shoulder pain since 2002; and from headaches since 2006. Hospital's counsel also read to the jury Shannon's acknowledgment that in the year prior to the intravenous epinephrine injection, she had been treated for headaches, anxiety, and neck and shoulder pain. Hospital argued that Shannon's ongoing physical complaints stem from somatoform disorder, which is a term used when psychological issues are manifested as physical complaints that have no physiological explanation.[7]

¶ 9 Hospital also presented Shannon's medical records from Dr. Shockey, a pulmonary critical care specialist who treated Shannon in the ICU. Dr. Shockey's report stated that his physical examination of Shannon after her transfer to the ICU revealed normal neurological function and no abnormalities relating to her neck or shoulders. However, Dr. Shockey's records indicated that Shannon had pulmonary edema "secondary to intravenous epinephrine."[8] Hospital also presented evidence that the results of two scans of Shannon's brain and a test to evaluate the blood vessels of Shannon's head and neck for evidence of vertebral artery dissection, brain cell death, or abnormal in-

7. See Eve G. Spratt et al., Somatoform Disorder, Medscape Reference (Jan. 24, 2012), http://emedicine.medscape.com/article/918628–overview. Persons suffering from somatoform disorder have symptoms that cannot be fully explained by general medical or neurologic conditions. See id.

8. "Pulmonary edema is a condition caused by excess fluid in the lungs. This fluid collects in the numerous air sacs in the lungs, making it difficult to breathe." Pulmonary Edema, Mayo Clinic (July 29, 2011), http://www.mayoclinic.org/diseasesconditions/pulmonary-edema/basics/definition/con–20022485.

tracranial flow were all normal. In addition, Hospital presented evidence that before Shannon was discharged, her chest CT scan and an MRI of her spine also came back normal aside from "minimal endplate degenerative changes."

¶ 10 Both sides supported their theories of causation with expert testimony. Shannon called two specialists in physical medicine, rehabilitation, and pain medicine (physiatrists); a neurologist; and a neuropsychologist. Dr. Fish, one of the physiatrists, testified that the intravenous delivery of epinephrine caused Shannon's current symptoms. Dr. Krusz, the neurologist, opined that Shannon had received an epinephrine dose three times larger than normal that led to cardiac and pulmonary problems, which caused anoxic brain injury. On cross-examination, Dr. Krusz acknowledged that it is a "speculative question" how Shannon would have reacted had the epinephrine been administered as ordered and conceded that a person might also react adversely to a normal dose of epinephrine administered subcutaneously. Dr. Loong, the neuropsychologist, testified that all of Shannon's current symptoms are explained by known medical conditions, which he indicated rules out a diagnosis of somatoform disorder. In addition, Dr. Anden, the second physiatrist, who had treated Shannon for musculoskeletal problems, diagnosed Shannon with thoracic outlet syndrome and myofascial pain syndrome.[9] Shannon also called Dr. Paradise, who testified that he was unable to determine whether Shannon's symptoms were complications resulting from the underlying allergic reaction that brought her into the emergency room, the epinephrine, or some combination of both. Dr. Paradise further indicated that complications can occur from epinephrine whether it is administered intravenously or subcutaneously.

¶ 11 Hospital presented testimony from five expert witnesses in its defense, including a neuroradiologist, a neuropsychologist, a cardiologist, a neurologist, and a psychiatrist. During cross-examination of three of Hospital's expert witnesses, Shannon used a report prepared by Dr. Dall, a physiatrist retained by Hospital but not called by either party for trial.[10] In his report, Dr. Dall diagnosed Shannon with a number of general medical conditions, including myofascial pain syndrome and fibromyalgia,[11] which he linked to the tetanic contraction she experienced immediately after the intravenous administration of epinephrine. Each time Shannon referred to Dr. Dall's report during her cross-examination of Hospital's experts, Hospital objected. The first two times, the trial court allowed the questioning, cautioning that the attorneys' questions are not evidence. But when Shannon continued this practice with Hospital's psychiatric expert, Dr. Eisendrath, the trial court eventually admonished Shannon not to use her questions to introduce evidence that had not been admitted.

¶ 12 At trial, Shannon and Hospital each sought to introduce evidence of the other's actions taken in anticipation of litigation. Shannon argued that Hospital's efforts to protect itself from liability explained a gap in the medical records between the time that Nurse administered the epinephrine and the time her replacement began taking notes after Nurse's shift ended. Shannon claims that the harm she suffered during this period was not documented because Nurse was occupied with completing risk management forms. Hospital argued that Nurse's completion of the risk management paperwork was privileged. In contrast, Hospital claimed the evidence that Shannon contacted

---

9. "Myofascial pain syndrome is a chronic pain disorder" in which "pressure on sensitive points in your muscles (trigger points) causes pain in seemingly unrelated parts of your body." *Myofascial Pain Syndrome*, Mayo Clinic (Jan. 5, 2012), http://www.mayoclinic.org/diseases-conditions/myofascial-painsyndrome/basics/definition/CON–20033195. This condition "typically occurs after a muscle has been contracted repetitively." *Id.*

10. Because Dr. Dall's report is not in the record, our description of its content is based on the portions of the report that Shannon's trial counsel read into the record.

11. "Fibromyalgia is a disorder characterized by widespread musculoskeletal pain accompanied by fatigue, sleep, memory and mood issues." *Fibromyalgia*, Mayo Clinic (Jan. 22, 2011), http://www.mayoclinic.org/diseases-conditions/fibromyalgia/basics/definition/CON–20019243.

her attorney while she was still hospitalized was relevant and admissible. The trial court agreed with Hospital, ruling that Shannon's early contact with her lawyer could be admitted because her "claims mindedness" is "relevant for the fact that it suggests that [she's] motivated to increase the amount of the claim." However, the trial court did not permit Shannon to explain "the fact that [Hospital was] acting to defend [itself] from early on ... after the incident" "[b]ecause this is a case where liability is admitted."

¶ 13 At the close of evidence, Shannon moved for a directed verdict on causation, arguing that at least some injury arising out of the incident had been proved. Shannon argued that the jury should be asked to render a verdict only on the issue of damages. The trial court initially responded, "I agree essentially there's going to be some damages in this case—some causation has been proven." However, the trial court then stated that "maybe there is a question about [causation]." Ultimately, the trial court implicitly denied the motion by submitting a special verdict form that required the jury to find causation before it could reach the question of damages.

¶ 14 The jury returned a verdict in Hospital's favor, answering "No" to the special verdict form question, "Was St. Mark's Hospital's breach of the standard of care a cause of the plaintiff's injuries?" [12] The jury accordingly did not award any damages. Shannon filed a motion for judgment notwithstanding the verdict and a motion for a new trial. On April 3, 2012, the trial court denied both motions. Shannon timely appealed.

ISSUES AND STANDARDS OF REVIEW

¶ 15 First, Shannon asserts that the trial court erred in several rulings admitting or excluding evidence. Shannon claims that the trial court erred by excluding Hospital's statements to her and others associated with her while she was hospitalized. Next, Shannon contends that the trial court erred by excluding references to the steps taken by Hospital to manage its legal risk while admitting references to Shannon's early contact with her attorney. Finally, Shannon challenges the trial court's admission of evidence related to pending criminal charges against her for unlawful possession of drug paraphernalia.

¶ 16 The trial court is afforded broad discretion to admit or exclude evidence, and we "will disturb its ruling only for abuse of discretion." *Daines v. Vincent,* 2008 UT 51, ¶ 21, 190 P.3d 1269; *see also Diversified Holdings, LC v. Turner,* 2002 UT 129, ¶ 6, 63 P.3d 686 (reviewing decision to admit or exclude evidence under rule 403 of the Utah Rules of Evidence for abuse of discretion); *Kilpatrick v. Wiley, Rein & Fielding,* 2001 UT 107, ¶ 95, 37 P.3d 1130 (reviewing admission of evidence as relevant under rules 401 and 402 for abuse of discretion). In reviewing for abuse of discretion, "we will not reverse a trial court's ruling on evidence unless the ruling was beyond the limits of reasonability." *Daines,* 2008 UT 51, ¶ 21, 190 P.3d 1269 (citation and internal quotation marks omitted). However, when the trial court's interpretation of an evidentiary rule is at issue, we apply a correctness standard of review, affording no deference to the trial court's decision. *See Barrientos v. Jones,* 2012 UT 33, ¶ 8, 282 P.3d 50; *McKelvey v. Hamilton,* 2009 UT App 126, ¶ 17, 211 P.3d 390 ("A district court's decision to admit or exclude evidence is generally reviewed for an abuse of discretion, unless it involves a legal question, which is reviewed for correctness."). Even when the trial court has erred in its evidentiary decision, "reversal is appropriate only in those cases where, after review of all the evidence presented at trial, it appears that absent the error, there is a reasonable likelihood that a different result would have been reached." *Stevenett v. Wal–Mart Stores, Inc.,* 1999 UT App 80, ¶ 8, 977 P.2d 508 (citation and internal quotation marks omitted); *see also* Utah R. Civ. P. 61 ("The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.").

12. Because the verdict form signed by the jury is not part of the record, we quote the transcript of the trial court's reading of it into the record.

¶ 17 As her second issue for appeal, Shannon argues that the trial court erred by limiting her cross-examination of one of the defense's expert witnesses. "While unduly harsh limitation of a key expert witness can amount to prejudicial error, the proper scope of cross-examination is within the sound discretion of the trial court and should not be disturbed absent a showing of abuse." *Whitehead v. American Motors Sales Corp.,* 801 P.2d 920, 923–24 (Utah 1990); *see also Perkins v. Fit–Well Artificial Limb Co.,* 30 Utah 2d 151, 514 P.2d 811, 813 (1973) ("The trial judge is allowed a wide discretion in his control over the examination of witnesses—lay and expert alike.").

¶ 18 Third, Shannon contends that the trial court erred by denying her motion for a directed verdict and her motion for judgment notwithstanding the verdict, because the evidence was insufficient to support the jury's verdict that Hospital's admitted breach of the standard of care caused Shannon no harm.

When a party challenges a trial court's denial of a motion for directed verdict or judgment notwithstanding the verdict on the basis of insufficiency of the evidence, we follow one standard of review: We reverse only if, viewing the evidence in the light most favorable to the prevailing party, we conclude that the evidence is insufficient to support the verdict.

*Brewer v. Denver & Rio Grande W. R.R.,* 2001 UT 77, ¶ 33, 31 P.3d 557 (citation and internal quotation marks omitted).

## ANALYSIS

### I. Evidentiary Rulings

#### A. Statements by Hospital

#### 1. Hospital's Statements Made Prior to Litigation

¶ 19 Shannon challenges the trial court's exclusion of the statements made by Hospital's administrators and employees that she contends were "undisputed admissions of causation and damages." She argues that by excluding the statements, the trial court also unfairly allowed Hospital to contradict and deny those same admissions at trial. Hospital maintains that the statements were prop-erly excluded as irrelevant because Hospital had stipulated that Nurse's improper administration of the epinephrine was a breach of the standard of care and because the statements did not admit that the improper delivery of epinephrine caused injury. Hospital also contends that the statements are expressions of apology and offers to pay medical expenses, which are inadmissible under rule 409 of the Utah Rules of Evidence and section 78B–3–422 of the Utah Code.

¶ 20 The trial court excluded the statements as irrelevant. *See* Utah R. Evid. 402 ("Irrelevant evidence is not admissible."). Evidence is relevant "if (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." *Id.* R. 401. To establish her claim of medical malpractice, Shannon was required to "prove four elements: (1) the standard of care required of health care providers under the circumstances; (2) breach of that standard by [Hospital]; (3) injury proximately caused by the breach; and (4) damages." *Morgan v. Intermountain Health Care, Inc.,* 2011 UT App 253, ¶ 8, 263 P.3d 405. Two of those elements—the standard of care and breach of that standard—were established through the stipulation of the parties. Accordingly, the issue before us is whether the statements are relevant to causation or damages, the two elements of Shannon's claim remaining for trial.

¶ 21 The particular statements Shannon sought to introduce included Hospital's risk manager's assurance, "[D]on't worry about this, we will take care of all of it" and, "[Shannon] can come here" if she needed help. She also sought to introduce testimony from her fiancé (Fiancé) that Hospital's administrators and its CEO reassured him, "[Y]ou don't have to worry about it. We'll take care of you. Things are going to be okay"; "You don't have anything to worry about on your end. We'll make sure it's taken care of"; and, "[E]verything is going to be okay. Things will be taken care of." In addition, Shannon's father (Father) would have testified that Hospital's CEO called him and said, "[T]here's been an incident, accident" and, "I want you to know we've given

[Shannon] the best room in the house, that we're going to take care of her, and that you don't need to be concerned about treatment or whatever it takes to get her well." Father was also prepared to testify that when he inquired about Shannon's need for future medical care, Hospital's risk manager responded, "[W]e have doctors and specialists at [Hospital's emergency room]" and that Hospital was "absolutely" going to take care of Shannon's condition. Father would have testified that Hospital's insurance adjuster told him, "[W]e're not going to pay for things unless we can actually prove they are a medical condition." The statements Shannon sought to admit also included Friend's recollection that a doctor told her and Shannon that they "were really sorry about everything that happened" and they "would make sure she was well taken care of from that point forward." Finally, Shannon wanted to admit the following statements Dr. Paradise made to her: "I'm really sorry. There was kind of a complication. We messed up.... [D]on't worry about any of this. We're going to take care of you." [13]

¶ 22 Shannon asserts that these statements are "highly relevant" to the issue of causation because they admit that "at least some pain and something adverse was caused by the epinephrine." In contrast, the trial court interpreted the statements simply as concessions that Nurse made a mistake by giving Shannon epinephrine intravenously, which had already been established through the parties' stipulation. Because none of the statements expressly admitted that specific injuries were caused by that negligence, the trial court determined that they did not make it more probable or less probable that Shannon's reactions and ongoing symptoms would not have happened but for the improperly administered epinephrine.

¶ 23 While we agree that Hospital's statements do not expressly indicate that Shannon's immediate reaction or any permanent injuries were caused by the intravenous delivery of epinephrine, we are not convinced that they are completely irrelevant to causation and damages. Dr. Paradise indicated that they had "messed up" and there had been "a complication," while Hospital administrators allegedly apologized and assured Shannon and her family that Hospital would take care of "it." These statements create at least an inference that Hospital connected Shannon's adverse reaction to the fact that Nurse improperly administered the epinephrine. That inference is relevant to prove that her immediate pain and suffering was caused by Nurse's error and to rebut Hospital's argument at trial that Shannon's reaction might have been the same even if the epinephrine had been injected subcutaneously. Furthermore, the statements concerning Shannon's future medical needs and the availability of Hospital's emergency services have some relevance to the issue of whether Nurse's negligence resulted in permanent injuries to Shannon, which Hospital correctly notes was the focus of Shannon's damages claim at trial. Thus, we agree with Shannon that the statements have some relevance to the issues of causation and damages which were tried to the jury. *See* Utah R. Evid. 401 (providing that evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence"); *State v. Jaeger*, 1999 UT 1, ¶ 12, 973 P.2d 404 ("[E]vidence that has even the slightest probative value is relevant under the definition in rule 401." (citation and internal quotation marks omitted)).

¶ 24 Nevertheless, most of the statements were inadmissible under rule 409 (apology rule) and section 78B-3-422 (apology statute).[14] The apology rule provides,

13. These statements are found in the depositions of Shannon, Fiancé, Father, and Friend, which are included in the record as attachments to Shannon's memorandum in support of her motion to admit the statements.

14. Shannon and Hospital both briefed the apology rule and the apology statute in the trial court and on appeal, but this was not the basis of the trial court's decision. However, we may properly affirm on any basis apparent on the record. *Bailey v. Bayles*, 2002 UT 58, ¶ 10, 52 P.3d 1158 ("[A]n appellate court may affirm the judgment appealed from if it is sustainable on any legal ground or theory apparent on the record...." (citation and internal quotation marks omitted)); *see also Francis v. State*, 2010 UT 62, ¶ 10, 248 P.3d 44 ("To be apparent on the record, [t]he record must contain sufficient and uncontroverted evidence supporting the ground or theory to

(a) Evidence of furnishing, promising to pay, or offering to pay medical, hospital, or similar expenses resulting from an injury is not admissible to prove liability for the injury.

(b) Evidence of unsworn statements, affirmations, gestures, or conduct made to a patient or a person associated with the patient by a defendant that expresses the following is not admissible in a malpractice action against a health care provider or an employee of a health care provider to prove liability for an injury:

(b)(1) apology, sympathy, commiseration, condolence, compassion, or general sense of benevolence; or

(b)(2) a description of the sequence of events relating to the unanticipated outcome of medical care or the significance of events.

Utah R. Evid. 409.[15] The apology statute's language is nearly identical to subsection (b) of the apology rule:

(2) In any civil action ... relating to an unanticipated outcome of medical care, any unsworn statement, affirmation, gesture, or conduct made to the patient by the defendant shall be inadmissible as evidence of an admission against interest or of liability if it:

(a) expresses:

(i) apology, sympathy, commiseration, condolence, or compassion; or

(ii) a general sense of benevolence; or

(b) describes:

(i) the sequence of events relating to the unanticipated outcome of medical care;

(ii) the significance of events; or

(iii) both.

Utah Code Ann. § 78B–3–422 (LexisNexis 2012).

¶ 25 Many of the statements Shannon identified are fairly interpreted as promises or offers to pay Shannon's medical expenses, including the risk manager's statements that "we will take care of all of it" and "[Shannon] can come here," if she needed help; Hospital administrators' assurances that "you don't have to worry about it"; and Hospital's CEO's statement to Father that "you don't need to be concerned about treatment or whatever it takes to get her well." Thus, these statements are inadmissible under subsection (a) of the apology rule. *See* Utah R. Evid. 409(a). To the extent that the statements are not covered by subsection (a), most of them are covered under subsection (b) as statements of "apology, sympathy, commiseration, condolence, compassion, or general sense of benevolence." *See id.* R. 409(b)(1); *see also* Utah Code Ann. § 78B–3–422(2)(a). Indeed, Fiancé characterized Hospital's statements as attempts at "reassuring" him, and the statements express benevolence and compassion by assuring Shannon and the persons associated with her that Hospital would take care of her. *Cf. Estate of Johnson v. Randall Smith, Inc.,* 135 Ohio St.3d 440, 989 N.E.2d 35, 37, 40 (2013) (holding that trial court did not exceed its discretion in determining that doctor's statement that "I take full responsibility for this. Everything will be okay" to a distressed patient was designed to comfort the patient and therefore was inadmissible under Ohio's version of the apology statute). Likewise, Dr. Paradise's statement that he was sorry for what had occurred falls squarely within the exclusion of statements, affirmations, or gestures of apology.[16] *See*

---

place a person of ordinary intelligence on notice that the prevailing party may rely thereon on appeal." (alteration in original) (citation and internal quotation marks omitted)).

**15.** Subsection (b) of rule 409 was added in 2010, after the 2007 intravenous epinephrine injection. *See* Utah R. Evid. 409 amend. notes; Joint Resolution on Hospital Claims Management, H.J.R. 34, § 1, 2010 Utah Laws 2952. However, Shannon does not challenge Hospital's contention that the rule is procedural and, therefore, that subsec-

tion (b) applies to Shannon's attempt to admit the statements at her 2011 trial.

**16.** Shannon argues that the apology rule and apology statute do not apply to statements by Dr. Paradise, because Dr. Paradise is not a defendant and the rule and statute apply only to statements "by the defendant." *See* Utah Code Ann. § 78B–3–422(2) (LexisNexis 2012); Utah R. Evid. 409(b). Hospital does not directly respond to this argument but implies that Dr. Paradise should be viewed as a "representative" of Hospital. We need not resolve this issue because we

Utah Code Ann. § 78B–3–422(2)(a)(i); Utah R. Evid. 409(b)(1).

¶ 26 However, the statements that there had been an accident or complication and that "[w]e messed up" do not fall within the categories discussed above. Shannon claims that these statements amount to statements of fault and that Utah's apology rule and apology statute do not exclude statements of fault. For that position, she relies on the legislative history of the apology statute and cases from other jurisdictions.

¶ 27 Utah is among the majority of states that have adopted laws prohibiting the introduction of statements of sympathy and apology made by health care providers after an unanticipated outcome of medical care. *See Davis v. Wooster Orthopaedics & Sports Med., Inc.*, 193 Ohio App.3d 581, 952 N.E.2d 1216, 1219 (2011) (collecting statutes and rules). Some states explicitly distinguish between statements of sympathy and statements of fault, with some providing that only statements of sympathy are inadmissible and with others excluding both statements of fault and statements of sympathy. *See, e.g.,* Cal. Evid.Code § 1160(a) (West 2009) (expressly providing that a "statement of fault," even if part of an expression of sympathy, "shall not be inadmissible pursuant to [California's apology statute]"); Colo.Rev.Stat. § 13–25–135(i) (LexisNexis 2013) (expressly providing that statements "expressing apology, fault, [or] sympathy . . . shall be inadmissible" as evidence of an admission of liability or as evidence of an admission against interest); *see also Davis*, 952 N.E.2d at 1219–20 (collecting statutes and rules). Unlike most of those laws, neither the Utah apology statute nor the Utah apology rule expressly addresses whether statements of fault are inadmissible. Accordingly, our task is to determine whether the Utah Legislature intended to extend the protection of the apology statute to statements of fault.[17] *See Grappendorf v. Pleasant Grove City*, 2007 UT 84, ¶ 9, 173 P.3d 166 ("When interpreting a statute, our goal is to give effect to the legislature's intent and purpose."). To discern that intent, we turn first to the language of the statute. *See id.*

¶ 28 Utah's apology statute excludes "unsworn statement[s], affirmation[s], gesture[s], or conduct" that fall within certain categories of expressions or descriptions. Utah Code Ann. § 78B–3–422(2). Subsection (2)(a) makes such expressions inadmissible if they express "apology, sympathy, commiseration, condolence, or compassion" or "a general sense of benevolence." *Id.* § 78B–3–422(2)(a). While the listed expressions do not explicitly include statements of fault, an admission of error is included in some definitions of apology. *See* Merriam–Webster, http://www.merriam-webster.com/dictionary/apology (last visited Feb. 18, 2014) (defining apology as "1 a: a formal justification: Defense b: Excuse; 2: an admission of error or discourtesy accompanied by an expression of regret"). *See generally State v. Canton*, 2013 UT 44, ¶ 13, 308 P.3d 517 ("In determining the ordinary meaning of nontechnical terms of a statute, our 'starting point' is the dictionary." (citation omitted)). However, an apology need not include an admission of fault. *See Davis*, 952 N.E.2d at 1221 (holding that language in the Ohio apology statute making expressions of apology inadmissible did not preclude the admission of statements of fault). Therefore, we are convinced that "[t]his is one of those cases where the dictionary fails to dictate the meaning that the statutory term[ ] 'must bear' in this context." *See Canton*, 2013 UT 44, ¶ 14, 308 P.3d 517.

¶ 29 Further, we are unable to ascertain from the structure or context of the apology

---

conclude that the exclusion of Dr. Paradise's statement "I'm really sorry" was harmless for the same reasons discussed below, *see infra* ¶ 35.

**17.** The Utah Legislature first enacted the apology statute in 2006. *See* Restrictions on Use of Physician Disclosures, ch. 225, § 2, 2006 Utah Laws 1077, 1078 (now codified at Utah Code Ann. § 78B–3–422 (LexisNexis 2012)). The legislature later amended the apology rule, in accordance with the Utah Constitution's allocation of powers. *See* Utah Const. art. VIII, § 4 (providing that the supreme court shall adopt rules of evidence and procedure and that the legislature may amend those rules upon a vote of two thirds of all members of both houses of the legislature); Joint Resolution to Amend Rule of Evidence, H.J.R. 38, § 1, 2011 Utah Laws 3137; Joint Resolution on Hospital Claims Management, H.J.R. 34, § 1, 2010 Utah Laws 2952.

statute whether the exclusion of statements of apology also excludes statements of fault. *See generally id.* ¶ 21 ("A first resort for selecting among a range of meanings left open by the dictionary is the structure and context of the statutory language."). Either interpretation is plausible based on the plain language of subsection 422(2)(a). The apology statute excludes statements describing the "sequence" or "significance" of the "events relating to the unanticipated outcome of medical care." Utah Code Ann. § 78B–3–422(2)(b) (LexisNexis 2012). Based on that language, the Ohio Court of Appeals interpreted Utah's apology statute as prohibiting the admission of statements of fault. *See Davis,* 952 N.E.2d at 1219. While we agree that the Ohio court's interpretation is one reasonable construction of subsection 422(2)(b), we are not convinced that it is the only reasonable interpretation of that language. Just as an apology may or may not include an admission of fault, a description of the sequence or significance of events related to an unanticipated medical outcome may or may not include an admission of fault. Thus, there is nothing about the context of the statute as a whole that dictates whether the term "apology" was intended to include statements of fault.

 ¶ 30 Because either an interpretation of the statute excluding statements of fault or an interpretation admitting them would be reasonable, the Utah apology statute is ambiguous on this point. *See State v. Watkins,* 2013 UT 28, ¶ 22, 309 P.3d 209 ("A statute is ambiguous only 'if it is *reasonably susceptible* of different interpretations.'" (quoting *Grant v. Utah State Land Bd.,* 26 Utah 2d 100, 485 P.2d 1035, 1037 (1971))). If a statute is ambiguous, "we generally resort to other modes of statutory construction and seek guidance from legislative history." *Marion Energy, Inc. v. KFJ Ranch P'ship,* 2011 UT 50, ¶ 15, 267 P.3d 863 (citation and internal quotation marks omitted). The original draft of the bill made inadmissible "any and all statements, affirmations, gestures, or conduct expressing apology, *fault,* sympathy, commiseration, condolence, compassion, or a general sense of benevolence." S.B. 41, § 2, 56th Leg., 2006 Gen. Sess. (Utah 2006) (original draft) (emphasis added), *available at*

http://le.utah.gov/2006/bills/sbillint/sb0041. htm. After the judiciary interim committee review of the bill, the sponsor deleted the word "fault" from the list of excluded statements. *See* S.B. 41 Substitute, § 2, 56th Leg., 2006 Gen. Sess. (Utah 2006) (amended), *available at* http://le.utah.gov/2006/bills/ sbillamd/sb0041s01.htm; Recording of Utah Senate Floor Debates, S.B. 41 Substitute, 56th Leg., 2006 Gen. Sess. (Jan. 25, 2006) (statement of Sen. David L. Thomas). This history suggests that at least some legislators considered and rejected the idea of making statements of fault inadmissible.

¶ 31 The record of the legislative debates of the bill lend some support to this conclusion. The information available from legislative debates often provides the thoughts or interpretations of only a single legislator, and, therefore, it may not significantly contribute to our understanding of what the members of both chambers of the Utah Legislature intended when they approved the final version of the bill. However, in some instances the information gleaned from the legislative history is of interest when we are unable to discern the legislative intent from more traditional methods of statutory construction. Recognizing the deficiencies in legislative history of this nature, we note that there was some discussion of the effect of the statute on the admissibility of admissions of fault before the statute's passage. During the Senate debate, the sponsor of the bill explained that the apology statute was designed to promote full disclosure by the medical industry in the hope of reducing the number of lawsuits and settlement costs. *See* Recording of Utah Senate Floor Debates, S.B. 41 Substitute, 56th Leg., 2006 Gen. Sess. (Jan. 25, 2006) (statement of Sen. David L. Thomas). In addition, the sponsor explained that if doctors "admit fault, you can actually use that" and stated, "I took that out of the bill." *Id.*

¶ 32 When the bill was advanced to the House of Representatives, the House sponsor made similar remarks. When asked whether admissions of fault would be admissible "if in this conversation [apologizing or expressing sympathy] he [the doctor] does admit fault," the sponsor responded, "I believe that that

would be admissible." *See* Recording of Utah House Floor Debates, S.B. 41 Substitute, 56th Leg., 2006 Gen. Sess. (Feb. 27, 2006) (statements by Reps. M. Susan Lawrence and Bradley G. Last). The House debate also addressed the impact of the exclusion of descriptions of the sequence or significance of events found in subsection 422(2)(b). When asked whether "a conversation that goes beyond apology and explains what happened" would be excluded, the House sponsor answered, "If there's no fault admitted," the conversation would be inadmissible. *Id.* (statements by Reps. Jackie Biskupski and Bradley G. Last). After a representative raised concerns that a doctor could admit responsibility and then take a contrary position at trial, the House sponsor stated, "First of all, let me just remind you that the word 'fault' was taken out of this legislation." *Id.* (statements by Reps. Ross I. Romero and Bradley G. Last).

¶ 33 Based on the purpose of the statute, the removal of the word "fault" from the bill before passage, and the ambiguous meaning of the term "apology" in this context, we conclude that the Utah Legislature did not intend to exclude statements of fault under section 78B–3–422. The trial court therefore erred in excluding the statements of fault. *Cf. Davis v. Wooster Orthopaedics & Sports Med., Inc.*, 193 Ohio App.3d 581, 952 N.E.2d 1216, 1218, 1220–21 (2011) (holding that the Ohio apology statute's prohibition against the admission of statements expressing "apology, sympathy, commiseration, condolence, compassion, or a general sense of benevolence" does not include a prohibition on statements of fault).

¶ 34 However, even though the trial court erred in excluding Hospital's statements of fault, Shannon must establish that she was prejudiced by the improper ruling. *See Stevenett v. Wal–Mart Stores, Inc.*, 1999 UT App 80, ¶ 8, 977 P.2d 508 ("[T]he person asserting error has the burden to show not only that the error occurred but also that it was substantial and prejudicial."). To address the impact of the exclusion of the statements of fault in this case, we first pause to discuss the dual concepts of fault in the context of a negligence action. A statement accepting fault may, as Hospital claims in this case, be an admission that the health care provider breached the standard of care without also admitting that the breach caused any injury to the patient. In contrast, a health care provider may concede both that it breached that standard of care and that the breach caused the patient's injuries. Under the statute as we have interpreted it, both types of statements of fault are admissible.

¶ 35 In the present case, Shannon identified no statements expressly admitting that the intravenous administration of epinephrine caused Shannon injury. Instead, the statements all relate to the breach of the standard of care. While we have indicated that the statements considered together could raise an inference supportive of a finding of causation for Shannon's alleged short-term injuries, *see supra* ¶ 23, we have also concluded that the majority of these statements are inadmissible offers of payment or expressions of apology. Standing alone, the only statements that acknowledge Hospital's fault are the statement by the CEO that "there's been an incident, accident" and the statement attributed to Dr. Paradise, "There was kind of a complication. We messed up." Taken in context, these statements admit only a breach of the standard of care and thus are simply cumulative of the stipulation that Nurse's intravenous administration of the epinephrine breached the standard of care. Thus, Shannon can show no prejudice from the trial court's decision to exclude these statements.

2. Hospital's Statements Made During Litigation

¶ 36 Shannon next argues that Hospital conceded that it caused her some harm at a pretrial hearing and then changed its position at trial. Hospital responds that it "never admitted that its mistake in misrouting the epinephrine caused 'some' or any injury" and that "at most, [Hospital] agreed that Shannon experienced a reaction after she received the epinephrine." During oral argument on the motions relating to the statements, the trial court asked Hospital's counsel, "Correct me if I'm wrong. You're

claiming that no pain, no nothing adverse was caused by the epinephrine?" Hospital's counsel answered,

> No, Your Honor.... [Shannon] got the epinephrine and she got a reaction and she went into the ICU for two days. The big fight in this case is over the fact that when she was discharged from the ICU, her cardiac function was normal, her neurologic function was normal, and everything else that [Shannon is] claiming is brain damage and such has nothing to do with that incident. That's what the fight in this case is.

The trial court responded, "[T]hat's my point. These statements all beg the very question that this case is about, which is, what precise harm was caused by this incident?"

¶ 37 Contrary to Shannon's assertion, counsel's statement at the pretrial hearing was not inconsistent with Hospital's defense that Nurse's error did not cause Shannon any harm. The trial court's question was whether Hospital claimed that Shannon suffered no harm as a result of the epinephrine itself—and not as a result of its erroneous method of delivery. In response, Hospital acknowledged that Shannon had a reaction to the epinephrine, but it did not concede that the intravenous administration of the drug was the cause. While Hospital's pretrial position is somewhat unclear and may have been refined at trial, there is nothing in its statement to the trial court that foreclosed the argument that Shannon's severe reaction to the epinephrine might have occurred even if Nurse had administered the drug subcutaneously. That question was not resolved during discovery or pretrial proceedings because, as Hospital correctly indicated, the focus of the litigation was on whether misrouting the epinephrine—rather than the epinephrine itself—caused the significant permanent injuries that Shannon alleges. In addition, the parties' stipulation, entered over a year before trial, expressly states that it

> does not constitute, and is neither intended, nor should it be construed as, an admission that this breach of the standard of care was the direct, proximate, or contributing cause of any damages allegedly sustained by [Shannon], which such causation

and damages are denied by [Hospital], both generally and specifically, to exist.

Under these circumstances, we cannot conclude that Hospital changed its position at trial.

¶ 38 In summary, even though the trial court erred by excluding Hospital's statements of fault, Shannon has not established that she was prejudiced. Furthermore, we are not persuaded that Hospital conceded the issue of causation before trial or changed its position at trial.

**B. Actions Taken in Anticipation of Litigation**

¶ 39 Shannon next argues that the trial court exceeded its discretion in its rulings on the admissibility of each party's actions taken in anticipation of litigation. She contends that the trial court's rulings are inconsistent because, on the one hand, it admitted references to Shannon's early contact with her attorney as relevant to causation and damages but, on the other hand, it excluded references to Hospital's early risk management efforts as irrelevant. We consider these issues as separate evidentiary rulings and review each for an abuse of discretion. *See Daines v. Vincent*, 2008 UT 51, ¶ 21, 190 P.3d 1269 (stating that decisions to admit or exclude evidence will be disturbed only for an abuse of discretion).

**1. Admission of Shannon's Actions**

¶ 40 On appeal, Shannon advances two arguments as to why evidence of Shannon's early consultation with an attorney should have been excluded. First, she asserts that the evidence was inadmissible under Utah Rule of Evidence 608 because Hospital used it to attack her character for truthfulness and to paint her medical complaints as exaggerated and untrustworthy. Hospital responds that the evidence was not introduced as evidence of Shannon's character for truthfulness.

¶ 41 Rule 608 of the Utah Rules of Evidence provides that "extrinsic evidence is not admissible to prove specific instances of a *witness's* conduct in order to attack or support the *witness's* character for truthful-

ness." Utah R. Evid. 608(b) (emphases added). "[B]y its plain language, rule 608 applies only to a *witness's* character for truthfulness." *State v. Perea,* 2013 UT 68, ¶ 56, 322 P.3d 624, 2013 WL 6038827. Shannon was not a witness at trial; she was not present and did not testify at trial either in person or by deposition. Accordingly, rule 608 is not applicable. *Cf. id.* ¶¶ 56–58 (acknowledging the policies behind rule 608 may be implicated in admitting out-of-court statements of non-testifying individuals but declining to determine in that case whether to apply rule 608's prohibition beyond its plain language).

¶ 42 Second, Shannon argues that the timing of her consultation with legal counsel was irrelevant to the issues of causation and damages. As discussed, evidence is relevant if it has any tendency to make a fact of consequence more probable or less probable. Utah R. Evid. 401. Shannon argues that the timing of the conversations with her attorney does not make it more probable or less probable that the intravenous administration of epinephrine caused her injury. In response, Hospital notes that Dr. Eisendrath relied on Shannon's early consultation with counsel in reaching his conclusion that Shannon suffered from somatization disorder—a type of somatoform disorder—rather than any physical condition.[18] Thus, Hospital claims that the evidence was admissible under rule 703 as the facts or data relied upon by an expert. *See* Utah R. Evid. 703 (providing that an expert may base his opinion on facts or data relied upon by experts in the field and that such facts or data may be disclosed to the jury even if otherwise inadmissible if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect). Shannon does not respond to Hospital's rule 703 argument, instead limiting her challenge on appeal to

rules 402 and 608. *See* Utah R. Evid. 402 (providing that irrelevant evidence is inadmissible); *id.* R. 608(b) (excluding evidence of specific instances of conduct to attack or support a witness's character for truthfulness). Because we conclude below that the trial court did not exceed its discretion in determining that the evidence was relevant, we do not address Hospital's alternative position that it was admissible under rule 703.

¶ 43 The parties have pointed us to two decisions from Utah's appellate courts that address whether evidence of a plaintiff's first contact with an attorney is admissible in an action arising from personal injuries. In *Pennington v. Allstate Insurance Co.,* 973 P.2d 932 (Utah 1998), the Utah Supreme Court considered the actions taken by the plaintiff after he retained his father-in-law as counsel to be relevant in upholding the trial court's imposition of sanctions against them for, among other things, inflating the plaintiff's damages claim. *See id.* at 934–39. Subsequently, in *Ottens v. McNeil,* 2010 UT App 237, 239 P.3d 308, this court distinguished *Pennington* and, in providing guidance to the trial court on remand, stated that because there was no claim that the plaintiff in *Ottens* had unethically inflated her damages, the evidence of when she first consulted counsel was irrelevant. *See id.* ¶¶ 71–72. These decisions stand for the unremarkable proposition that the relevance of evidence is dependent upon its probative value in establishing or refuting a matter at issue in a particular case. *See* Utah R. Evid. 401 (defining relevant evidence). Accordingly, neither is controlling here.

¶ 44 "Because Utah case law is not fully developed on this issue, we look to the case law from other jurisdictions for guidance." *State v. Montiel,* 2005 UT 48, ¶ 15, 122 P.3d 571 (citation and internal quotation marks omitted). Courts that have considered this

---

18. Dr. Eisendrath's testimony also addressed the January 31, 2007 standard lien form that Shannon signed for her chiropractor, Dr. Clayton, providing that Dr. Clayton would be paid from any settlement or judgment against Hospital. Dr. Eisendrath explained that the lien might influence a patient in a way similar to the filing of litigation and that it also calls into question the impartiality of any diagnosis by the chiropractor. Shannon argues that Dr. Eisendrath's discussion of the lien exacerbated the harm from admitting evidence of her first contact with her attorney. However, the subject of the standard lien had been explored without objection during Dr. Clayton's cross-examination, and the form itself was later admitted into evidence without objection. Dr. Eisendrath's discussion of the lien was not unduly prejudicial and was relevant to show Dr. Clayton's potential bias. Accordingly, the trial court did not exceed its discretion in admitting it.

issue are not in agreement. Those that have held that evidence of actions taken in anticipation of litigation is inadmissible have reasoned that it is improper for parties to "attempt[ ] to discredit plaintiffs for exercising rights fundamental to or granted by the legal system." *Carlyle v. Lai*, 783 S.W.2d 925, 929–30 (Mo.Ct.App.1989) (holding that the admission of evidence of when the plaintiffs in a wrongful death action hired counsel was irrelevant and prejudicial); *see also Watson v. Builders Square, Inc.*, 563 So.2d 721, 722–23 (Fla.Dist.Ct.App.1990) (holding that trial court abused its discretion in admitting irrelevant evidence of when plaintiff contacted an attorney); *Nguyen v. Haworth*, 916 S.W.2d 887, 888–89 (Mo.Ct.App.1996) (affirming trial court's order granting a new trial due to the admission of testimony that plaintiff planned to sue defendant soon after defendant struck plaintiff's minor son with an automobile); *Martinez v. Williams*, 312 S.W.2d 742, 752 (Tex.Civ.App.1958) (affirming trial court's exclusion of evidence of when plaintiff hired counsel as unfairly prejudicial because "it is not proper to show in evidence that a personal injury litigant is 'claims minded' in an effort to attack his credibility"). In *Carlyle v. Lai*, 783 S.W.2d 925 (Mo.Ct.App.1989), the Missouri Court of Appeals explained, "Accessing the legal system is normally not to be discouraged and, exercising one's right to utilize the legal system within established rules and procedures should normally not ... be used to attempt to discredit a litigant with a jury." *Id.* at 928–30 (reversing and remanding for a new trial because defendant injected an improper issue into the trial by cross-examining plaintiff and arguing in summation about the fact that plaintiff hired an attorney fifteen days after the death of her son).

¶ 45 Unlike the evidence at issue in these decisions, the evidence of when Shannon first consulted counsel was identified by a testifying expert as part of the basis of the expert's opinion. Under similar circumstances, jurisdictions have reached conflicting conclusions on the admissibility of such evidence. In *Yingling v. Hartwig*, 925 S.W.2d 952 (Mo.Ct.App.1996), the trial court allowed the defense to introduce expert testimony from a doctor who opined that patients who are involved in litigation have subjective complaints that last longer than patients who do not sue. *Id.* at 954–55. On appeal, the Missouri Court of Appeals held that the trial court exceeded its discretion by admitting the testimony because the "[s]tatements about unidentified people with unidentified injuries and complaints are irrelevant to prove whether [the plaintiff] continues to suffer from her injuries." *Id.* at 956. The appellate court further reasoned that even if the testimony were somehow logically relevant, any probative value was far outweighed by its prejudicial effect to the plaintiff because the testimony "essentially constituted the doctor's personal opinion as to whether the jury should believe [this] plaintiff ... when she testifies about her injuries and complaints." *Id.*

¶ 46 The federal district court in Kansas took a contrary approach in *Watson v. Taylor*, 477 F.Supp.2d 1129 (D.Kan.2007), holding that the plaintiff was not entitled to a new trial based on the admission of expert testimony about the secondary gain theory and the admission of evidence that she hired an attorney to file a worker's compensation claim. *See id.* at 1132, 1135–37. Specifically, the expert explained that under the secondary gain theory some patients, including the plaintiff, "may not be very motivated to get well because of how it might adversely impact pending worker's compensation and related civil litigation." *Id.* at 1132, 1136–37. The *Watson* court acknowledged that "as a general proposition, access to the legal system is a fundamental right that should not be discouraged." *Id.* at 1135. Nevertheless, it concluded that the timing of when the plaintiff hired her attorney and filed her worker's compensation claim was pertinent to the issue of whether a subsequent surgery caused her injuries and to the defense's secondary gain theory. *Id.; see also Beller v. Saari*, No. 92–2234–L, 1994 WL 608593, at *2 (D.Kan. Oct. 27, 1994) (finding no unfair prejudice stemming from evidence of personal injury plaintiff's contact with an attorney because that fact was consistent with the defense's theory of secondary gain as an explanation of plaintiff's complaints). The *Watson* court specifically rejected the holdings of

*Yingling* and *Carlyle,* concluding instead that "given the types of damages plaintiff is seeking to recover," the defense's questions about "whether secondary gain was playing any kind of role in plaintiff's situation" were relevant and not unduly prejudicial. *Watson,* 477 F.Supp.2d at 1136; *see also Williams v. McCoy,* 145 N.C.App. 111, 550 S.E.2d 796, 800 (2001) ("[E]vidence concerning when a litigant seeks legal counsel can, in some instances, be admissible.... [I]nquiry concerning when plaintiff hired an attorney is admissible to impeach a litigious plaintiff *and* is relevant to rebut the existence and extent of plaintiff's injuries from the accident, if evidence exists to support the inquiry on either basis.").

■ ¶47 In this case, Dr. Eisendrath testified that his psychological evaluation takes into account when an individual first contacts an attorney because that fact "influence[s] that individual's trajectory." According to Dr. Eisendrath, "[i]f they're aiming to maximize their litigation, it's different from maximizing their recovery." Dr. Eisendrath explained that once litigation is filed, there may be "competing motivations," with the goal of physical recovery conflicting with the goal of litigation success. He further testified that Shannon's early consultation with an attorney was one factor he found consistent with his diagnosis that she suffers from somatization disorder. In light of Dr. Eisendrath's expertise and his testimony about his consideration of this fact in his diagnosis, we cannot conclude that the trial court's decision that this evidence is relevant was "beyond the limits of reasonability," *see Daines v.*

*Vincent,* 2008 UT 51, ¶21, 190 P.3d 1269 (citation and internal quotation marks omitted). *See also* Utah R. Evid. 401 (providing that relevant evidence need only make a consequential fact more probable or less probable).[19]

### 2. Exclusion of Evidence of Hospital's Actions

■ ¶48 Next, Shannon contends that the trial court exceeded its discretion by "exclud[ing] all references to [Hospital's] own immediate legal preparations and immediate general acts of risk management activity." Shannon argues that this evidence was relevant and necessary to explain the absence of critical information in her medical records that would have described her symptoms and provided proof that the intravenous delivery of epinephrine caused her injuries. According to Shannon, the "risk management module"[20] allowed Hospital to cover its own potential liability preemptively and to shield details of Shannon's adverse reaction as legally privileged material. Shannon suggests that Nurse was replaced so that she could complete risk management paperwork and that Shannon's care suffered as a result. She also suggests that Hospital's act of preparing for litigation soon after the erroneous drug administration is itself an admission of causation. Hospital disputes these allegations and asserts that there was no interruption in Shannon's medical care. It further responds that the risk management process was irrelevant because of the stipulation that Hospital violated the standard of care by administering the epinephrine intravenously.

19. Despite its relevance, evidence should be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. Utah R. Evid. 403; *see also Yingling v. Hartwig,* 925 S.W.2d 952, 956 (Mo.Ct.App.1996) (stating that even if it were relevant, expert testimony on how litigation affects a person's subjective complaints of physical injury was unfairly prejudicial); *Martinez v. Williams,* 312 S.W.2d 742, 752 (Tex.Civ. App.1958) ("[W]here the defendant merely seeks to show that the plaintiff is a chronic personal injury litigant the evidence will be excluded on the theory that its slight probative value is outweighed by the danger of unfairly prejudicing the claim of an innocent litigant." (citation and internal quotation marks omitted)). We do not consider whether the evidence of when Shannon

consulted counsel is unduly prejudicial, however, because Shannon has not argued on appeal that this evidence was inadmissible under rule 403. *See* Utah R.App. P. 24(a)(9) ("The argument shall contain the contentions and reasons of the appellant with respect to the issues presented ... with citations to the authorities, statutes, and parts of the record relied on."); *Gilley v. Blackstock,* 2002 UT App 414, ¶10 n. 2, 61 P.3d 305 (declining to address an issue that was not argued in the appellant's brief).

20. At trial, Hospital's counsel referred to the paperwork as "peer review protocol" that Hospital's policies require "when there's some incident," such as a medical mistake.

¶ 49 In her opening statement, Shannon stated that Hospital focused on legal issues shortly after Nurse incorrectly administered the epinephrine. Hospital objected to these comments. After opening statements, the trial court ruled that Hospital's risk management activities were privileged and prohibited Shannon from asking about them or suggesting that Hospital had wrongfully withheld information about them.[21] *See generally* Utah Code Ann. § 78B–1–137 (Lexis-Nexis 2012) (describing privileged communications that are inadmissible in court); Utah R. Civ. P. 26(b)(1) (providing that information "created specifically as part of a request for an investigation, the investigation, findings, or conclusions of peer review, care review, or quality assurance processes of any organization of health care providers" are privileged matters that are not discoverable or admissible). Apart from her vague claims of unfairness, Shannon has not pointed to any authority to support her assertion that the trial court exceeded its discretion by limiting Shannon's references to Hospital's risk management paperwork.[22]

¶ 50 Furthermore, any presumed error in excluding references to the fact that Hospital quickly initiated its risk management procedures was harmless. Contrary to Shannon's claims, Nurse testified that her shift ended as scheduled shortly after she incorrectly administered the epinephrine and that another nurse began caring for Shannon.[23] In addition, the trial court permitted Shannon to highlight the absence of notations of vital-sign readings in her medical records, and trial counsel examined at least two witnesses about those gaps. Nurse acknowledged a sixty-minute period during which there are no notes of Shannon's blood pressure and a seventy-minute period with no oxygen-saturation readings, but she also testified that she did not observe Shannon's blood pres-

sure or oxygen saturation drop below normal levels, even after the intravenous administration of epinephrine.[24] Dr. Paradise explained that Shannon would have been monitored remotely and that any abnormal readings would have set off alarms. In addition, Shannon presented testimony regarding her early physical response to the epinephrine. Friend and Nurse both witnessed her reaction and described those events in detail. Dr. Paradise also testified about Shannon's medical condition immediately after the intravenous administration of the epinephrine and his treatment of her symptoms. He indicated that he treated Shannon for low blood pressure,[25] elevated heart rate, shortness of breath, chest pain, nausea, vomiting, headache, and pulmonary edema.

¶ 51 There is nothing about Hospital's compliance with its risk management procedures that suggests Hospital's error caused Shannon's alleged permanent injuries or refutes Hospital's theory that her immediate reaction might have occurred even if the epinephrine had been administered as directed. There was extensive evidence that Shannon's test results were normal when she was discharged, that she suffered from most of her complaints long before the intravenous administration of epinephrine, and that one of her own witnesses could not exclude the possibility that her immediate adverse reaction may have occurred even if Nurse had administered the epinephrine subcutaneously. It is also significant that Shannon did not testify at trial and the jury therefore did not hear Shannon's own description of her symptoms. Under these circumstances, even if the jury had been informed about Nurse's completion of risk management paperwork, we are not convinced that there is a reasonable likelihood that the outcome would have been more favorable to Shannon.

21. The trial court offered to give a curative instruction, but Hospital declined.

22. Shannon concedes that she did not seek to introduce specific information from the risk management paperwork.

23. Nurse's replacement was not called by either party to testify at trial.

24. Nurse testified that Shannon had an elevated heart rate and palpitations after receiving the epinephrine. Although she did not observe Shannon's blood pressure readings drop, Nurse believed that Shannon's blood pressure was a little low later, when Nurse was not there.

25. Friend also testified that Shannon's blood pressure dropped at one point.

## C. Admission of Shannon's Possession of Drug Paraphernalia

¶ 52 Next, Shannon argues that the trial court abused its discretion by admitting evidence of her pending misdemeanor charge for possession of drug paraphernalia. In doing so, Shannon overstates the evidence that was admitted at trial. In fact, the trial court significantly limited the evidence that could be presented. Shannon and Hospital then stipulated that the jury could be informed only that "on July 4, 2011 [Shannon] was in possession of a plastic [pen] straw with opiate residue." Shannon contends that the trial court erred by admitting even this fact. Hospital argues that we should not reach the merits of this issue because Shannon either waived her argument or invited any error when she introduced evidence of prior drug use through her own expert witness and stipulated to the language informing the jury about her drug paraphernalia possession charge.

¶ 53 We are not persuaded that Shannon has waived this issue or invited error. Shannon adjusted her opening statement and witness questioning and agreed to the stipulation after the trial court had refused to exclude all of the evidence related to Shannon's arrest. In an effort to control the impact of the evidence that would be admitted, Shannon introduced her drug use in her opening statement, elicited testimony from her experts that such drug use, if true, would be an indication of poor decision-making as a result of her brain injury, and consented to the language of the stipulation. However, Shannon's counsel clarified, "[W]e still reserve[ ] all our earlier objections and I'm not waiving any of that for appeal purposes...." Shannon's attempt to mitigate any harm from the trial court's adverse ruling by introducing the evidence, asking her witnesses about it, and stipulating to the precise language the jury would hear did not amount to a waiver or an invited error. *Cf. Wilson v. IHC Hosps., Inc.*, 2012 UT 43, ¶¶ 67, 76, 289 P.3d 369 (concluding that the appellants'

"strategic decision to attempt to mitigate the damage arising from improperly admitted evidence does not reflect an intent to waive their right to appeal the admission of that evidence" and that the appellants "did not invite error because their agreement to enter [the challenged] evidence was made after and was, in fact, in response to improper ... evidence introduced by [the appellee]"); *see also Kobashigawa v. Silva*, 129 Hawai'i 313, 300 P.3d 579, 599 (2013) ("[O]nce a trial court makes an unequivocal ruling admitting evidence over a party's motion in limine to exclude, that party's subsequent introduction of the evidence does not constitute a waiver of its objection for appellate review."). Shannon did not concede that the evidence was admissible; she merely agreed to the way in which it would be presented to the jury and attempted to mitigate any harm from the adverse ruling. Accordingly, Shannon's challenge to the trial court's denial of her motion to exclude the pen straw evidence is properly before us.

### 1. Admissibility Under Rules 402 and 403

¶ 54 Shannon attacks the trial court's admission of the pen straw evidence on relevancy grounds.[26] The record in this case shows that the trial court carefully examined the evidence of Shannon's July 4, 2011 arrest. The trial court reasoned that the possession of paraphernalia "ties into whether or not there is substance abuse as an ongoing issue in [Shannon's] life and whether the substance abuse provides an alternative causation for her symptom[s]." In other words, the trial court concluded that the evidence that Shannon possessed the pen straw with drug residue was offered by the defense to prove that the cause of Shannon's claimed injuries was unrelated to Nurse's breach of the standard of care.

¶ 55 One of Hospital's experts, Dr. Eisendrath, testified that Shannon's substance abuse may have motivated her to complain about pain to various physicians in order to

26. On appeal, Shannon also argues that the pen straw evidence should have been excluded under rule 404(b) of the Utah Rules of Evidence. However, Shannon did not present this argument to the trial court, and we therefore do not consider

it further. *See 438 Main St. v. Easy Heat, Inc.*, 2004 UT 72, ¶ 51, 99 P.3d 801 (explaining that issues that are not raised at trial are usually deemed waived).

obtain the medication. He also testified that Shannon's substance abuse could explain her complaints about impaired cognitive functions. Furthermore, Dr. Eisendrath's diagnosis included his opinion that Shannon suffers from substance abuse disorder, something he considered relevant to his assessment of her psychological condition generally and his specific opinion that her symptoms were caused by somatization disorder. The trial court determined that the evidence was "highly relevant" to the issues before the jury. The cause of Shannon's symptoms was a key question for the jury to decide. Based on Dr. Eisendrath's testimony and the low threshold necessary to establish relevance, the trial court did not exceed its discretion in concluding that the evidence of Shannon's drug use was relevant to the issue of causation. *See* Utah R. Evid. 401; *id.* R. 402.

¶ 56 However, relevant evidence must also be admissible under rule 403. Under that rule, relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." *Id.* R. 403.

¶ 57 Shannon argues that the pen straw evidence was "used solely to prejudice the jury against Shannon and confuse the issues before it." However, the trial court effectively mitigated the risk of unfair prejudice. First, the trial court allowed Hospital to present only the fact that Shannon was found in possession of paraphernalia with drug residue. This limited the admissible evidence to the fact most relevant to Hospital's causation theory—Shannon's recent drug abuse. The trial court excluded evidence not relevant to that theory, including Shannon's DUI charge,[27] her failure to pass the field sobriety test, and the arresting officer's observations stemming from the July 4, 2011 arrest. Next, the court urged the parties to reach a stipulation so that the jury would have no

need to consider the credibility of the information. The result of those efforts was a carefully worded factual statement: "[O]n July 4, 2011 [Shannon] was in possession of a plastic [pen] straw with opiate residue." By reducing the admissible evidence to one unemotional statement, the trial court properly assured that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. *See Glacier Land Co. v. Claudia Klawe & Assocs.*, 2006 UT App 516, ¶ 24, 154 P.3d 852 ("[T]he trial court is granted broad discretion when weighing the probative value of evidence against the reasons for exclusion enumerated in rule 403.").

¶ 58 In summary, the evidence of Shannon's possession of drug paraphernalia was relevant to refuting Shannon's claim that the intravenous administration of epinephrine caused her reported symptoms. Furthermore, the trial court narrowly tailored the extent of the evidence that could be admitted, thereby minimizing the tendency of the evidence to lead to unfair prejudice. Thus, the trial court did not exceed its discretion in admitting this evidence.

### 2. Admissibility Under Rule 703

¶ 59 As an additional ground for excluding this evidence, Shannon contends that it is "not the type of evidence that can be relied upon by any medical expert in reaching a diagnosis or opinion." Rule 703 provides,

An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion sub-

---

**27.** In spite of the trial court's order to exclude references to Shannon's DUI, Hospital's expert, Dr. Lawton, testified during cross-examination that he saw "videos when [Shannon] got the DUI." In response, Shannon asked the court to

exclude any further references to substance abuse. The trial court refused to "tak[e] something that is potentially very relevant off the table because of . . . an inadvertent slip."

stantially outweighs their prejudicial effect. Utah R. Evid. 703. Therefore, the relevant inquiry in this case is "whether there was evidence supporting the trial court's ruling that [this type of information is] of the sort experts in [Dr. Eisendrath's] field *reasonably and regularly rely upon.*" *See State v. Kelley,* 2000 UT 41, ¶ 20, 1 P.3d 546 (emphasis added); *cf. Green v. Louder,* 2001 UT 62, ¶¶ 28–29, 29 P.3d 638 ("The proper inquiry is whether accident reconstructionists reasonably and regularly rely on computer software programs ... to verify the accuracy of their findings.... [O]nce an expert renders an opinion, [he] must be allowed to explain the foundation for that opinion." (second alteration in original) (citation and internal quotation marks omitted)).

¶ 60 The trial court ruled that Shannon's possession of drug paraphernalia was "fair for the defense to go into," provided that a proper foundation would be laid at trial to establish that "this is evidence of a type that is typically relied upon by experts in the field." Thereafter, Dr. Eisendrath testified that all the categories of evidence he reviewed, including police reports and court document reports, are records that he typically relies on in forming his professional medical opinions. Dr. Eisendrath also stated,

> Those things are very useful in terms of when we try to come to a comprehensive assessment of somebody, the more data you can get the better so that [you are] getting data from as many sources as possible, including collateral sources, beyond what the individual patient tells you. What they tell you is very important but

sometimes getting information from other sources is also critically important.

Dr. Eisendrath then testified that when he examined Shannon in August 2010 his opinion was that Shannon's substance abuse problem was in remission, but that he had no way to corroborate Shannon's self-report that she no longer abused controlled substances. Hospital asked whether Dr. Eisendrath had seen any new evidence that changed his opinion. Dr. Eisendrath responded that Shannon's July 4, 2011 possession of a plastic pen straw with opiate residue indicated that "the substance abuse is certainly, as of July, a pretty active problem." By testifying that this information is useful "when [trying] to come to a comprehensive assessment of somebody," Dr. Eisendrath set forth an adequate foundation to establish that "experts in [his] particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject." *See* Utah R. Evid. 703. Accordingly, we reject Shannon's argument that Dr. Eisendrath could not properly rely on this evidence in forming his opinion.[28]

## II. The Scope of Cross–Examination

¶ 61 Next, Shannon contends that the trial court erred by limiting the scope of her cross-examination of Hospital's psychiatric expert, Dr. Eisendrath. She argues that this error prevented her from demonstrating that "Dr. Eisendrath ignored Dr. Dall's diagnosis that Shannon suffered from specific generally known physical medical conditions" and that therefore "there could be no diagnosis of any type of psychological somatization disorder." Hospital argues that Shannon was permitted to cross-examine Dr. Eisendrath

---

**28.** Shannon also contends that her possession of the pen straw was inadmissible under rules 608 and 609 of the Utah Rules of Evidence. As discussed, *supra* ¶ 41, rule 608 governs the use of extrinsic evidence to attack or support a witness's character for truthfulness. Utah R. Evid. 608(b). Because Shannon did not testify, this rule does not apply. Rule 609 controls the impeachment of a witness by evidence of her *conviction* of a crime. Utah R. Evid. 609. Again, this rule is limited by its terms to impeachment of witnesses. Furthermore, under rule 609, "the final judgment of the court on a guilty verdict or plea ... constitutes a conviction for impeachment purposes." *State v. Duncan,* 812 P.2d 60,

64 (Utah Ct.App.1991). Rule 609 does not apply where, as here, the evidence did not pertain to a criminal conviction, let alone even indicate that Shannon had been charged with a crime. *See* Utah R. Evid. 608 ("*Except for a criminal conviction under Rule 609,* extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness." (emphasis added)); *cf. State v. Valdez,* 2006 UT App 290, ¶¶ 9–12, 141 P.3d 614 (analyzing defendant's argument that the trial court abused its discretion by disallowing cross-examination on a witness's dismissed charge under rule 608).

extensively and that Shannon was properly "required to ask an appropriate question rather than read wholesale portions of Dr. Dall's report, which was not in evidence." Thus, Hospital argues that the trial court's only limitation on Shannon's cross-examination was the form of counsel's questions.

¶ 62 "An assertion or opinion given on direct testimony that bears on a key issue in the case is a proper subject of cross-examination," and parties are permitted to conduct cross-examination into the bases of opinions offered by their opponents' expert witnesses. *Whitehead v. American Motors Sales Corp.*, 801 P.2d 920, 925 (Utah 1990). The opponent of the expert testimony may challenge the suitability or reliability of the materials relied upon by the expert, even if those materials are not in evidence. *State v. Clayton*, 646 P.2d 723, 726 (Utah 1982). However, the trial court is granted considerable discretion in exercising control over the examination of both lay and expert witnesses. *See Perkins v. Fit–Well Artificial Limb Co.*, 30 Utah 2d 151, 514 P.2d 811, 813 (1973); *accord Paulos v. Covenant Transp., Inc.*, 2004 UT App 35, ¶ 20, 86 P.3d 752; *see also* Utah R. Evid. 611(a) (indicating that the trial court "should exercise reasonable control over the mode and order of examining witnesses" so as to "make those procedures effective for determining the truth," "avoid wasting time," and "protect witnesses from harassment or undue embarrassment").

¶ 63 In the present case, Shannon cross-examined Dr. Weight, Hospital's neuropsychologist, and Dr. Lawton, Hospital's neurologist, by reading or referring to portions of Dr. Dall's report and then asking the expert to explain his contrary conclusions. In particular, Shannon established through her cross-examination of Dr. Weight and Dr. Lawton that Dr. Dall had diagnosed Shannon with known medical conditions. Shannon asked Dr. Lawton to explain his contrary conclusion and asked Dr. Weight to explain why Dr. Dall's diagnosis does not eliminate somatoform disorder as a viable diagnosis. Hospital objected on the ground that Shannon was reading Dr. Dall's report to the jury even though it had not been admitted into evidence. The trial court initially overruled

the objection, explaining, "They're all covered in the general caution that ... just because a fact is stated in [counsel's] question, that's not evidence." When Shannon continued her practice of reading portions of Dr. Dall's report during her cross-examination of Dr. Eisendrath, Hospital again objected. The trial court overruled the objection, indicating that although Dr. Dall's report was not in evidence, the witness's responses to the attorney's questions were. But when Shannon continued reading Dr. Dall's report to Dr. Eisendrath, the trial court interrupted, stating, "Wait a minute. That's been asked and answered.... [Y]ou've already established that he has the report. Don't just read the report to get the report in front of the jury." Shannon resumed her cross-examination of Dr. Eisendrath, and when she later read from Dr. Dall's report again, the trial court issued yet another warning, "You can bring information to the witness' attention to get his opinions on it, but it has to be a legitimate question ..., not simply reading things to the jury that aren't in evidence. Don't do it again, or you're done." Shannon then asked about Dr. Dall's conclusions in the form of a hypothetical question, but Hospital eventually objected to that form of questioning as well. The trial court then sustained the objection, and Shannon moved on.

¶ 64 The trial court did not unduly limit Shannon's cross-examination of Dr. Eisendrath. Shannon was permitted to question Dr. Eisendrath about the fact that he had reviewed Dr. Dall's report when forming his own opinion and that Dr. Eisendrath's opinion was contrary to Dr. Dall's conclusions. In particular, Shannon's cross-examination focused Dr. Eisendrath on the fact that Dr. Dall had diagnosed Shannon with "known medical conditions," including myofascial pain syndrome and fibromyalgia. She then required Dr. Eisendrath to explain his diagnosis of somatization disorder in light of Dr. Dall's contrary diagnosis of physical conditions that would exclude somatization disorder as a possible diagnosis. Thus, despite the trial court's concern with the form of her questions, Shannon was allowed to probe Dr.

Eisendrath's opinion at length and effectively demonstrate that Dr. Dall disagreed with it.

¶ 65 Nevertheless, Shannon cites rule 703 of the Utah Rules of Evidence in support of her argument that the trial court improperly admonished her for reading Dr. Dall's report to the jury. While it provides that an expert may base his opinion on inadmissible evidence of the kind reasonably relied on by experts in the particular field, *see* Utah R. Evid. 703, "[r]ule 703 cannot be used to introduce evidence through an expert for purposes other than the expert's conclusions and thus circumvent other rules of evidence," *Patey v. Lainhart*, 1999 UT 31, ¶ 33, 977 P.2d 1193. The trial court did not exceed its discretion in cautioning Shannon not to use her cross-examination of Hospital's experts as a way to circumvent the lack of foundation for Dr. Dall's report caused by the failure of either party to require his presence at trial. *Cf. Clayton v. Ford Motor Co.*, 2009 UT App 154, ¶ 24, 214 P.3d 865 (excluding a non-testifying expert's report for lack of foundation despite fact that another defense expert testified that he was aware of the report and rejected it in forming his own opinion).

¶ 66 Another deficiency in Shannon's challenge to the trial court's caution against reading Dr. Dall's report into the record is that she cannot establish that she was prejudiced by it. Shannon admits that she "extensively" and "fully" cross-examined two other defense experts regarding Dr. Dall's report. Indeed, Shannon questioned Dr. Lawton about Dr. Dall's report and the records or reports of seven other doctors who treated or examined Shannon after the incident and who, like Dr. Dall, had reached different conclusions from those reached by Dr. Lawton. Specifically, she asked Dr. Lawton, "[D]id you know [Dr. Dall] indicated that he thought [Shannon's] present injury with regards to her neck and such was consistent with the tetanic contraction as described?" After Dr. Lawton explained his disagreement with that aspect of Dr. Dall's report, Shannon asked whether Dr. Lawton also disagreed with Dr. Dall's medical diagnosis of fibromyalgia. Dr. Lawton responded, "I agree that [Shannon has] complained of a lot of pain[,] which is what [Dr. Dall is] talking about." Shannon also used Dr. Dall's report in cross-examining Dr. Weight. During that line of questioning, Shannon attempted to undermine Dr. Weight's diagnosis of somatoform disorder by eliciting testimony from Dr. Weight that a person can have somatoform disorder only if her symptoms cannot be "fully explained" by a known general medical condition. Dr. Weight then acknowledged that Dr. Dall's diagnosis of myofascial pain syndrome would qualify as a known general medical condition but criticized Dr. Dall's diagnosis as "one that is purely a report by the patient." Shannon also questioned Dr. Weight about Dr. Dall's diagnosis that Shannon suffers from fibromyalgia, but Dr. Weight testified that fibromyalgia "is not an established diagnosis" and therefore Shannon's symptoms were "not fully explained." Thus, prior to Dr. Eisendrath's testimony, Shannon had described Dr. Dall's report during her questioning of two other defense experts, and the jury had heard enough to understand that Hospital's experts held opinions contrary to those of some other doctors, including a doctor hired by Hospital. Shannon reiterated Dr. Dall's conclusions during her cross-examination of Dr. Eisendrath despite the trial court's admonitions and elicited his admission that his opinion was contrary to that of Dr. Dall. Under these circumstances, the trial court's caution that she not use her cross-examination of Dr. Eisendrath to get the contents of Dr. Dall's report in front of the jury was not harmful to Shannon.

¶ 67 Our confidence in the jury's verdict is further supported by Shannon's introduction of other evidence corroborating Dr. Dall's conclusion that Shannon had a recognized medical condition. Shannon's expert, Dr. Anden, testified [29] that Shannon suffered from myofascial pain syndrome, and other testimony established that Shannon had been prescribed medication used primarily to treat fibromyalgia. Consequently, the jury was aware that other medical professionals either diagnosed or treated Shannon for both fibromyalgia and myofascial pain syndrome, the same medical conditions that Dr. Dall's re-

---

29. Dr. Anden's deposition was read to the jury in lieu of live testimony.

port included in its diagnosis of Shannon's condition.

¶ 68 In summary, the trial court acted within its discretion by cautioning Shannon on the use of Dr. Dall's report in her cross-examination of Dr. Eisendrath. *See Perkins v. Fit–Well Artificial Limb Co.*, 30 Utah 2d 151, 514 P.2d 811, 813 (1973) ("The trial judge is allowed a wide discretion in his control over the examination of witnesses—lay and expert alike. Unless he abuses that discretion and prevents the witness from answering a proper question on a material matter, he should not be reversed."); *see also* Utah R. Evid. 611 ("The court should exercise reasonable control over the mode and order of examining witnesses and presenting evidence...."). Even if the trial court had exceeded its discretion in that regard, Shannon cannot establish that she was prejudiced. The jury was aware of the pertinent contents of Dr. Dall's report and that he and other physicians had diagnosed Shannon with recognized medical conditions rather than the psychological condition of somatoform disorder advanced by Hospital's experts.

### III. Sufficiency of the Evidence

¶ 69 Finally, Shannon argues that the trial court erred by denying both her motion for directed verdict and her motion for judgment notwithstanding the verdict on the issue of causation, because the evidence was insufficient to support a conclusion that Hospital caused her no injury. According to Shannon, the evidence showed that "at a minimum, Hospital caused some harm to Shannon that was foreseeable." Hospital argues that there was abundant evidence to support the jury's conclusion that Shannon's immediate reaction to the epinephrine would have been the same whether it was administered intravenously or subcutaneously, that Shannon did not suffer any permanent injuries from the erroneous administration of epinephrine, and that Shannon "did not seek to recover for her initial reaction after the epinephrine administration."

¶ 70 Because "[i]t is the exclusive function of the jury to weigh the evidence and to determine the credibility of the witnesses, ... we will not overturn a verdict on a challenge to the sufficiency of the evidence [s]o long as some evidence and reasonable inferences support the jury's findings." *Brewer v. Denver & Rio Grande W. R.R.*, 2001 UT 77, ¶ 36, 31 P.3d 557 (alterations in original) (citations and internal quotation marks omitted). Furthermore, "[t]he existence of contradictory evidence or of conflicting inferences does not warrant disturbing the jury's verdict when the sufficiency of the evidence is challenged on appeal." *Id.* (alteration in original) (citation and internal quotation marks omitted). Here, there is sufficient evidence to support the jury's verdict.

¶ 71 Contrary to Hospital's contention, Shannon did seek to recover for her immediate reaction. She submitted an exhibit listing more than $80,000 in past medical expenses, including expenses incurred at the hospital on January 22, 2007, and the ensuing days, weeks, and months. Shannon reiterated this figure to the jury in closing arguments. However, we agree with Hospital that the evidence is sufficient to support the jury's finding of no causation. Several physicians testified that Shannon's immediate reaction could have resulted from the same dose of epinephrine delivered subcutaneously and that Nurse's error in administering the epinephrine intravenously may not have caused Shannon any injury. Specifically, Dr. Paradise, who testified as a treating physician, indicated that he was unable to determine whether the immediate symptoms Shannon experienced were complications resulting from the underlying allergic reaction that brought her into the emergency room, the epinephrine, or some combination of both. He also testified that complications can occur from epinephrine whether it is administered intravenously or subcutaneously. Likewise, Dr. Hartman, a defense expert, testified that Shannon's symptoms after she received the epinephrine could have occurred from the original allergic reaction, from epinephrine delivered either intravenously or subcutaneously, or from some combination. Although Dr. Krusz, a neurologist serving as Shannon's expert witness, testified that he believed Shannon had received an epinephrine dose three times larger than normal, resulting in anoxic brain injury, he

also acknowledged the possibility that subcutaneous injection could have led to adverse reactions. Dr. Krusz testified that it is a "speculative question" how Shannon would have reacted had the epinephrine been administered as ordered. In other words, multiple witnesses acknowledged weaknesses in Shannon's causation theory, and at least two witnesses testified that they could not say which of several possibilities caused Shannon's immediate reaction.

¶ 72 Moreover, Hospital provided multiple experts who testified that Shannon does not suffer from any permanent injuries caused by the intravenous administration of epinephrine. And there was extensive evidence presented that the results of myriad medical tests administered by different physicians were negative for any medical condition. Finally, Hospital presented expert testimony that Shannon suffers from somatoform disorder, a condition in which psychological issues are manifested as physical complaints that have no physiological explanation. In light of the conflicting evidence from which the jury could draw either conclusion as to causation, the trial court properly denied Shannon's motions for directed verdict and judgment notwithstanding the verdict.[30]

## CONCLUSION

¶ 73 Hospital's statements of apology, compassion, and offers to pay are inadmissible under rule 409 of the Utah Rules of Evidence and Utah Code section 78B–3–422, and Hospital's statements of fault are merely cumulative of the parties' stipulation that Hospital's intravenous administration of epinephrine was a breach of the standard of care. Evidence of when Shannon hired legal counsel was not inadmissible under rules 401 or 608, and the exclusion of Hospital's risk management procedures was neither an abuse of discretion nor harmful. Under the unique facts of this case, the narrowly tailored evidence on Shannon's possession of drug paraphernalia was admissible. The trial court also did not exceed its discretion in controlling Shannon's cross-examination of Dr. Eisendrath. Finally, the trial court was correct in denying Shannon's motion for directed verdict and motion for judgment notwithstanding the verdict because there was sufficient evidence to support the verdict that Hospital's breach did not cause Shannon any injury.

¶ 74 Affirmed.

---

30. Shannon also claims that she is entitled to a new trial due to the cumulative harm caused by the trial court's errors. "Under the cumulative error doctrine, we will reverse only if the cumulative effect of the several errors undermines our confidence ... that a fair trial was had." *State v. Dunn*, 850 P.2d 1201, 1229 (Utah 1993) (omission in original) (citation and internal quotation marks omitted); *see also Radman v. Flanders Corp.*, 2007 UT App 351, ¶ 20, 172 P.3d 668. "In assessing a claim of cumulative error, we consider all the identified errors, as well as any errors we assume may have occurred." *Dunn*, 850 P.2d at 1229. Even viewing the effect of the trial court's exclusion of Hospital's statements of fault in conjunction with any assumed errors, our confidence in the fairness of the trial is not undermined.