**2018 UT App 24**

# THE UTAH COURT OF APPEALS

UTAH DEPARTMENT OF TRANSPORTATION,
Appellant,
*v.*
TARGET CORPORATION AND
WEINGARTEN/MILLER/AMERICAN FORK LLC,
Appellees.

Opinion
No. 20160122-CA
Filed February 8, 2018

Fourth District Court, American Fork Department
The Honorable Thomas Low
No. 090102037

Sean D. Reyes, Barbara E. Ochoa, William H.
Christensen, and Stanford E. Purser, Attorneys for
Appellant

Kevin E. Anderson and Jason E. Wilkinson,
Attorneys for Appellee Target Corporation

Jeffrey W. Appel, Matthew N. Evans, and Robert P.
Harrington, Attorneys for Appellee
Weingarten/Miller/American Fork LLC

JUDGE RYAN M. HARRIS authored this Opinion, in which JUDGES
KATE A. TOOMEY and JILL M. POHLMAN concurred.

HARRIS, Judge:

¶1      One extremely small portion of a massive freeway interchange was built on land that the Utah Department of Transportation (UDOT) took from claimants Target Corporation (Target) and Weingarten/Miller/American Fork LLC (Miller) (collectively, Claimants). The vast majority of the interchange was constructed upon UDOT's own land or upon land taken from others. Claimants complain that the interchange prevents

or impairs motorists from viewing their shopping center, and they claim the right to recover severance damages from UDOT related to this loss of visibility and related to the loss of a right-out exit[1] from the shopping center's parking lot. The trial court allowed that claim to proceed to a jury trial, and a jury awarded Claimants more than $2.3 million in severance damages.

¶2     UDOT now appeals, and asserts that the trial court erred in even allowing Claimants' suit for severance damages to reach the jury. UDOT asserts that Claimants' evidence was insufficient, regarding both causation and damages, to support their claims. For the reasons discussed below, we find UDOT's arguments unpersuasive, and therefore affirm.

BACKGROUND[2]

¶3     In 2009, UDOT determined that two major highway construction projects (the Projects) needed to be built in fast-growing Utah County. One project involved widening and reconstructing Interstate 15 through essentially the entire length of Utah County, from Santaquin to the Salt Lake County line. This project, in total, was more than twenty-two miles long. The other project involved the construction of a new east-west

---

1. A "right-out exit" allows traffic to exit (but not necessarily enter) a facility, but only by turning right.

2. Our recitation of the facts is presented in the light most favorable to the jury's verdict, and comes from the testimony and evidence developed at trial. *See Smith v. Fairfax Realty, Inc.*, 2003 UT 41, ¶ 3, 82 P.3d 1064 (on review from the denial of a motion for a directed verdict, an appellate court recites facts in the light most favorable to the verdict). During the trial, the jury heard testimony from several witnesses, including five engineers, two expert appraisers, and a representative of Target with experience in shopping center development.

arterial road from American Fork through Lehi to Saratoga Springs. This project, in total, was seven miles long. The two Projects intersect at a point in American Fork where Main Street crosses I-15. Before the Projects, there was already a freeway interchange at the site, allowing motorists to cross I-15 on Main Street via an overpass, or get on or off I-15 at that same location. The Projects called for the widening of both I-15 and American Fork Main Street, and therefore UDOT found it necessary to completely rebuild the existing freeway interchange (the Interchange).

¶4     In order to facilitate construction of the new Interchange at that location, UDOT condemned various properties, including three relatively small portions[3] of the Alpine Valley Shopping Center (the Shopping Center), a mall owned largely by Claimants that is located on the northeast corner of the Interchange. The Shopping Center is a large retail facility with many stores and shops. It has one major "anchor" tenant—Target—as well as other smaller retail stores, and includes a large outdoor parking lot. Claimants' witnesses testified at trial that the Shopping Center is designed to draw customers from a large regional area, and that customers are drawn there due to "ease of access and convenience, and knowing how to get there by visibility or good signage." Target owns the land on which its store is located, and Miller owns most of the Shopping Center's remaining land. Both Target and Miller share a parking lot, and also share a cross-easement across the entirety of the Shopping Center. The shared parking lot abuts Main Street, and prior to completion of the Projects a driver could easily access northbound I-15 by making a right-hand turn out of the south side of the parking lot, driving briefly westbound along Main

---

3. Two of these three parcels were taken in fee simple, and the third was taken in the form of a perpetual slope easement. The two parcels taken in fee simple were very small (756 and 928 square feet, respectively). The slope easement is larger, comprising 8,825 square feet.

Street, and then merging onto northbound I-15. The original northbound I-15 on-ramp was "at grade"—on the same level—with Main Street.

¶5     UDOT chose to rebuild the Interchange using an innovative "diverging diamond" design, which is "a very unique cross-over type interchange" that involves cars temporarily driving on the left side of the road. Significantly for present purposes, a diverging diamond design requires a lot of space, and in this case that design required that the bridge over the freeway be built higher than other design options, and also required much larger and higher on- and off-ramps. To take one specific example, the northbound I-15 on-ramp was raised from "at grade" (in the before condition) to a height of some twenty-three feet (in the after condition). The new Interchange's increase in height affected Claimants' property and the surrounding area in several ways.

¶6     First, the heightened overpass and raised northbound I-15 on-ramp required UDOT to gradually raise the elevation of Main Street as it approached the Interchange. Because Main Street itself was being raised, UDOT determined that, "for safety reasons," it could no longer permit right-out access from the south end of the Shopping Center onto the now-heightened Main Street, although UDOT was able to preserve right-in access from westbound Main Street into the parking lot. In connection with closing this right-out exit, UDOT took from Claimants one small rectangular parcel located on the south side of the shared parking lot, along Main Street. UDOT did not build any portion of the Interchange on this parcel. Prior to the taking, the right-out exit was the most heavily used exit in the parking lot, due to its proximity to the northbound I-15 on-ramp. After the taking, the closure of the right-out exit required all traffic exiting the parking lot to use an intersection located along the east side of the Shopping Center, along Kawakami Drive.

¶7     Next, to facilitate construction of the heightened northbound I-15 on-ramp, UDOT built a retaining wall along the

northbound on-ramp. In order to support the retaining wall, UDOT found it necessary to construct an earthen slope alongside the retaining wall. UDOT did not, however, have enough space on its own property for the entire dirt support slope, so UDOT took a perpetual "slope easement" across a long, narrow parcel of Claimants' land that runs alongside the northbound I-15 on-ramp. UDOT then placed a large amount of dirt on the slope easement, creating a slope that supported the retaining wall that, in turn, supported the raised on-ramp onto northbound I-15. While the retaining wall itself is not located on the slope easement, the dirt slope supporting the retaining wall is at least partially located on the slope easement.[4]

¶8     At trial, Target's representative testified that UDOT informed him that "it was not feasible to maintain the right-out [exit] due to the new construction, the design, specifically, of this diverging diamond." However, no other witness at trial testified that the condemnation of Claimants' specific parcels was "essential to the completion of the project as a whole." *See Ivers v. Utah Dep't of Transp.*, 2007 UT 19, ¶ 21, 154 P.3d 802, *overruled in part on other grounds by Utah Dep't of Transp. v. Admiral Beverage Corp.*, 2011 UT 62, 275 P.3d 208 (holding that a claimant is

---

4. UDOT correctly points out that Claimants introduced no exhibit or testimony demonstrating exactly where the boundaries for the slope easement were located, or demonstrating exactly how much of the dirt slope ended up being located on the slope easement. But it is clear from the trial testimony that at least *some* of the dirt slope supporting the northbound I-15 on-ramp is located on the slope easement, and therefore is located on property owned by Claimants. In addition, during oral argument, UDOT's counsel acknowledged that UDOT placed the dirt slope at least partially on Claimants' property. Moreover, one of the jury instructions proposed by UDOT and submitted to the jury stated that UDOT acquired the slope easement "for the purpose of constructing and maintaining slopes on the property as part of the Project[s]."

entitled to severance damages related to a view-impairing structure "built on property other than that which was condemned" only "if the use of the condemned property is essential to the completion of the project as a whole").

¶9     Claimants also presented evidence that completion of the Interchange affected the visibility—defined as the ability of others to view into the property, *see id.* ¶ 12—of the Shopping Center. Prior to the Projects, motorists moving in any direction on I-15 or Main Street could easily see the Shopping Center as they were driving. After the Projects, by contrast, visibility into the Shopping Center decreased, chiefly because of the larger and taller Interchange. Parts of the Interchange, including the taller and wider bridge over the freeway, as well as new or taller retaining walls and raised on- and off-ramps, now impair motorists' view of the Shopping Center. Claimants argued that they were entitled to be compensated not just for the value of the parcels that were taken, but also for "severance damages" representing the full loss of the market value of the Shopping Center caused by the taking, including diminution in value caused by reduced visibility and access.

¶10    In support of this contention, Claimants presented testimony from an expert appraiser (Appraiser). Appraiser valued Claimants' remaining property twice, once in the "before" condition, as though the Interchange had never been built, and once in the "after" condition, taking into account any effect that the Interchange had on the property's value. Appraiser explained that the difference in these values constituted the measure of Claimants' severance damages. Appraiser concluded that Claimants' remaining property was worth approximately 7.5% less in the "after" condition than in the "before" condition, and he calculated Claimants' severance damages, based on that conclusion, as more than $2.3 million. Appraiser testified that there were two main factors that contributed to the property's diminution in value: loss of visibility, largely because of the presence of the larger and taller Interchange, and loss of the right-out exit onto Main Street.

However, Appraiser did not attempt to provide any specific values for these individual components of loss—that is, Appraiser did not provide the jury with any specific amounts for damages related to loss of the right-out exit alone, or for damages related to loss of visibility alone, or for damages related to loss of visibility related to any specific component of the Interchange. At the close of Claimants' case, UDOT moved for a partial directed verdict on the issue of severance damages, arguing that Claimants should not be allowed to recover severance damages at all. Specifically, UDOT argued that Claimants failed to "elicit[] any testimony from any witness that this property was essential to the project as a whole," and therefore their claim for severance damages was infirm under the rubric set forth in *Ivers*, 2007 UT 19, ¶ 21. The trial court denied UDOT's motion, reasoning that although no witness explicitly testified that UDOT's takings were "essential to the project as a whole," the evidence was nonetheless sufficient to potentially support a finding that the takings were "essential."

¶11 After deliberation, the jury awarded Claimants a total of $87,910 for the value of the property interests that UDOT actually took (the two small parcels taken in fee simple plus the perpetual slope easement). In addition, the jury awarded Claimants a combined $2,381,294 in severance damages. UDOT takes issue with the severance damages portion of the jury's verdict, and first expressed its displeasure with this award by asking the trial court to enter a judgment notwithstanding the verdict, again asserting that Claimants "failed to establish through testimony of any fact or expert witness that the property taken by [UDOT] was 'essential to the completion of the project as a whole.'" The trial court denied that motion.

ISSUES AND STANDARD OF REVIEW

¶12 UDOT now appeals the award of severance damages to Claimants, and asserts that the trial court should have granted its motions for partial directed verdict and/or for judgment

notwithstanding the verdict on that issue. We review a trial court's denial of a motion for directed verdict for correctness. *Proctor v. Costco Wholesale Corp.*, 2013 UT App 226, ¶ 6, 311 P.3d 564. Likewise, we review for correctness a trial court's denial of a motion for judgment notwithstanding the verdict. *Neff v. Neff*, 2011 UT 6, ¶ 49, 247 P.3d 380. On either a motion for directed verdict or a motion for judgment notwithstanding the verdict, we will reverse the trial court's ruling "only if, viewing the evidence in the light most favorable to the prevailing party, we conclude that the evidence is insufficient to support the verdict." *Lawrence v. MountainStar Healthcare*, 2014 UT App 40, ¶ 18, 320 P.3d 1037 (citation and internal quotation marks omitted).

ANALYSIS

¶13 It is a bedrock principle of both the federal and state constitutions that the government cannot take a citizen's property for public use without paying that citizen "just compensation" for the value of the property taken. *See* U.S. Const. amend. V; *see also* Utah Const. art. I, § 22. "The policy behind Utah's constitutional provision is to ensure that the burden for damage done to private property is 'distributed among all the taxpayers' rather than 'upon those only who sustained the injury.'" *See Utah Dep't of Transp. v. Admiral Beverage Corp.*, 2011 UT 62, ¶ 21, 275 P.3d 208 (quoting *Kimball v. Salt Lake City*, 90 P. 395, 397 (Utah 1907)). The constitutional guarantee of "just compensation" "is triggered when there is any substantial interference with private property which destroys or materially lessens its value, or by which the owner's right to its use and enjoyment is in any substantial degree abridged or destroyed." *Id.* ¶ 22 (citation and internal quotation marks omitted). There exist "two broad categories of takings": physical takings and regulatory takings. *Alpine Homes, Inc. v. City of West Jordan*, 2017 UT 45, ¶ 18. This case involves a physical taking.

¶14 A physical taking is the most obvious kind of taking, and occurs when the government physically appropriates a citizen's

property. *See View Condo. Owners Ass'n v. MSICO, LLC*, 2005 UT 91, ¶ 31, 127 P.3d 697. Certainly, a landowner is entitled to compensation when the government undertakes a "physical invasion or permanent occupation of his or her property." *America West Bank Members, LC v. State*, 2014 UT 49, ¶ 32, 342 P.3d 224 (citation and internal quotation marks omitted). There are several different types of physical takings, including, for instance, an outright fee-simple taking as well as the taking of a more limited property interest such as an easement. *See* Utah Code Ann. § 78B-6-502 (LexisNexis 2012) (providing that "fee simple" ownership and "easement[s]" are both "rights in lands [that] are subject to being taken for public use"). In this case, the jury determined that Claimants were entitled to $87,910 as "just compensation" for UDOT's three physical takings. No party has appealed that portion of the jury's decision.

¶15 When the land that is condemned constitutes only a portion of a larger parcel, a landowner may be entitled to more than merely the market value of the portion of the land that is actually taken. Specifically, the landowner may be entitled to "severance damages" for any diminution in the value of the remaining portion of the landowner's property, as long as the landowner can demonstrate that the diminution in value was caused by the taking. *See id.* § 78B-6-511(2) (LexisNexis 2012) (stating that, "if the property sought to be condemned constitutes only a part of a larger parcel," a landowner may recover "the damage[] which will accrue to the portion not sought to be condemned by reason of its severance from the portion sought to be condemned"); *see also Severance Damages*, Black's Law Dictionary (10th ed. 2014) (defining "severance damages" as "compensation awarded to a landowner for the loss in value of the tract that remains after a partial taking of the land").

¶16 The "cardinal and well-recognized rule" regarding the measure of severance damages is that a landowner is entitled to recover "the difference in market value of the property before and after the taking." *See Admiral Beverage*, 2011 UT 62, ¶ 30

(citation and internal quotation marks omitted); *see also id.* ¶ 31 (stating that a court, "in order to correctly evaluate . . . severance damages," must view those damages "in the composite as it will be after the taking and after the improvement has been constructed"). After a four-year detour to the contrary, our supreme court has now determined that severance damages may include damages resulting from the property's reduced visibility. *See id.* ¶¶ 15–19 (overruling *Ivers*, 2007 UT 19, ¶¶ 11–15, and stating that "when a landowner suffers the physical taking of a portion of his land, he is entitled to severance damages amounting to the full loss of market value in his remaining property caused by the taking," including damages for loss of visibility). A landowner bears the burden of proving an entitlement to a specific amount of severance damages. *State ex rel. Road Comm'n v. Williams*, 452 P.2d 548, 549–50 (Utah 1969).

¶17   An entitlement to severance damages exists, however, only if landowners can show a causal link between the taking of a portion of their land and the diminution in the value of the remainder. *See Ivers*, 2007 UT 19, ¶ 18 (stating that "[w]hether severance damages are awardable hinges on whether the severance of the condemned property, and the use of *that* property, *caused* damage to the remaining property"); *see also Utah Dep't of Transp. v. D'Ambrosio*, 743 P.2d 1220, 1222 (Utah 1987) (stating that a landowner is entitled to recover severance damages "caused by the taking of a portion of the parcel of property where the taking or the construction of the improvement *on that part* causes injury to that portion of the parcel not taken"); Utah Code Ann. § 78B-6-511(2) (providing that recoverable severance damages consist of those damages incurred "by reason of [the remaining parcel's] severance from the portion sought to be condemned").

¶18   In this case, Claimants assert entitlement to two types of severance damages. First, Claimants maintain that their remaining property has diminished in value due to loss of visibility that they claim has resulted from the construction of the new Interchange. Second, Claimants assert that their

remaining property has diminished in value because of the loss of the right-out exit onto American Fork Main Street. For its part, UDOT asserts that Claimants have not presented sufficient evidence to support their claim to either type of severance damages, but for different reasons.

A.    Severance Damages for Loss of Visibility

¶19    With regard to Claimants' assertion that they are entitled to severance damages for loss of visibility, UDOT maintains that Claimants have not presented sufficient evidence of the necessary causal link between the taking of their property and their claimed severance damages.

¶20    There are two methods by which a landowner can demonstrate the requisite causal link. First, if the visibility issues stem from a "structure" that is built upon the part of the property that was taken, causation is presumed. *See Ivers*, 2007 UT 19, ¶ 20 (stating that "when the state condemns a portion of land and builds a view-impairing structure directly on that land, the damage to the remaining property is recoverable . . . because when the condemned land is used for the construction of the view-impairing structure, the damage to the remaining property is clearly caused by the severance"). Second, if the visibility issues stem from a "structure" that was *not* built on the part of the property that was taken, causation is not presumed, and the property owner is entitled to severance damages only if it can demonstrate that "the use of the condemned property is essential to the completion of the project as a whole." *Id.* ¶ 21.

¶21    The main thrust of UDOT's arguments, both before the trial court and on appeal, is that Claimants have not established, through competent evidence, that their parcels were "essential" to the Projects as a whole, and therefore cannot avail themselves of the second method of proving severance damages. As noted above, none of Claimants' witnesses directly testified that the taken parcels were "essential" to the Projects as a whole.

¶22    Claimants, however, maintain that they can demonstrate causation through the first method, and that they therefore need not prove that the taken parcels were "essential to the Projects as a whole." Specifically, Claimants assert that the view-impairing structure is the entire Interchange, and they argue from that premise that, because part of the Interchange (the dirt slope supporting the retaining wall on the northbound I-15 on-ramp) was built on their property, causation for severance damages should be presumed. UDOT disagrees, and posits that the view-impairing "structure" is not the entire Interchange but, instead, the specific component parts of the Interchange (such as the raised freeway overpass, or new retaining walls on the southern end of the Interchange), only one of which (the northbound I-15 on-ramp) was even partially built on Claimants' taken property. In order to address these arguments, we must confront three questions.

1.

¶23    First, we must determine whether, as a legal matter, a view-impairing structure that is only *partially* constructed upon the taken parcel is presumed to have caused severance damages to the remaining parcel or, instead, whether the view-impairing structure must be constructed *entirely* upon the taken parcel to qualify for a presumption of causation. We conclude that, in order to be presumed to have caused severance damages to the remaining parcel, a view-impairing structure need not be entirely constructed within the taken parcel.

¶24    We draw support for this conclusion from *Utah State Road Commission v. Miya*, 526 P.2d 926 (Utah 1974). In that case, the state condemned, for a road construction project, one small part (comprising less than one acre) of a forty-four-acre parcel owned by the claimant. *Id.* at 927. As part of that project, the state then constructed a "viaduct" over some adjacent railroad tracks. *Id.* at 928. While it is not entirely clear from the opinion, it appears that

the viaduct was at least partially constructed upon the land taken from the claimant.[5] *Id.* The claimant asserted a right to recover severance damages related to the loss of view on its remaining acreage caused by the construction of the viaduct. *Id.* at 929. The trial court awarded claimant $8,000 in severance damages, and our supreme court affirmed, holding that "the loss of view occasioned by a proposed public structure to be erected, *in part at least* upon a parcel of property taken by condemnation from a unit of property" could be compensated with an award of severance damages. *Id.* (emphasis added) (citations omitted).

¶25   Indeed, we cited this portion of *Miya* when we considered the *Ivers* case. *See Utah Dep't of Transp. v. Ivers*, 2005 UT App 519, ¶ 23 & n.6, 128 P.3d 74, *rev'd in part on other grounds*, 2007 UT 19, 154 P.3d 802. In so doing, we noted that the rule set forth in *Miya*—"requiring the view-obstructing improvement to be constructed, *at least partially*, upon the land severed from the condemnee"—is in keeping "with the principles recognized in both earlier and later Utah cases." *Id.* (emphasis added). While our supreme court has not directly addressed this issue since *Miya*, that court's opinions in *Ivers* and *Admiral Beverage* contain language indicating continued support of the rule set forth in *Miya*. *See Admiral Beverage*, 2011 UT 62, ¶ 2 (noting that "*[n]o part of* the I-15 freeway itself is located on or touches Admiral's

---

5. This court has read *Miya* in this manner once before. In this court's decision in *Utah Department of Transportation v. Ivers*, 2005 UT App 519, 128 P.3d 74, *rev'd in part on other grounds*, 2007 UT 19, 154 P.3d 802, we noted some uncertainty about whether the viaduct in the *Miya* case was partially constructed on the taken property, but concluded that *Miya* could not plausibly be read any other way. *Id.* ¶ 23 & n.6 (stating that, "[i]n *Miya*, the viaduct was constructed, in part, on the land taken from the landowners," and noting in a footnote that the court's "reliance on" a particular quotation "indicates that the viaduct was built, at least in part, upon a parcel of property taken from the landowners").

property" (emphasis added)); *Ivers*, 2007 UT 19, ¶ 3 (noting in support of its rejection of claimant's severance damages claim that "*[n]o portion of* the raised highway, its footings, or its foundation was constructed on the condemned land" (emphasis added)).

¶26 Further support for our conclusion can be found in case law from other jurisdictions that, like ours, allow recovery of severance damages for loss of visibility.[6] At least some of those courts have held that such damages are recoverable even where the view-impairing structure is built only partially on the taken property. *See, e.g., State v. Strom*, 493 N.W.2d 554, 561 (Minn. 1992) (holding that where "property taken by the state from the abutting owner was used" to build a view-obstructing structure, the landowner may recover severance damages for loss of visibility); *id.* at 564 (Simonett, J., concurring) (noting specifically that "the embankment [that obstructs visibility] is *partially* on land taken" from the landowner (emphasis added)).

¶27 We also note that UDOT appeared to concede this point at oral argument. In response to questioning from the court, UDOT conceded that Claimants would, at least theoretically, be entitled to severance damages for loss of visibility caused solely by the northbound I-15 on-ramp, because UDOT conceded that the on-ramp (although not necessarily the Interchange) was at least partially constructed on property taken from Claimants.[7] As

---

6. Some jurisdictions (including our own from 2007 to 2011, *see Ivers*, 2007 UT 19, ¶¶ 11–15) do not allow any recovery of severance damages for loss of visibility. *See, e.g., Department of Transp. v. Marilyn Hickey Ministries*, 159 P.3d 111, 116 (Colo. 2007); *see also* 7A Nichols on Eminent Domain, § G9A.04[4][c][iii] (Matthew Bender, 3rd ed.).

7. UDOT's concession here was limited because, as discussed below, UDOT points out that Claimants presented to the jury only a total composite figure comprising all of its claimed

(continued…)

noted elsewhere herein, the only part of the northbound on-ramp (for that matter, the only part of the entire Interchange) that was constructed on Claimants' property is part of the slope supporting the on-ramp's retaining wall. By conceding a theoretical entitlement to severance damages for loss of visibility caused by the northbound on-ramp, UDOT was necessarily conceding the point that a structure, in order to be considered to have presumptively caused severance damages, does not have to be *entirely* constructed on land taken from the claimant.

2.

¶28    Second, we must determine what the "structure" is for purposes of the causation analysis. There are three possibilities. First, "structure" could be defined extremely broadly, to mean the entirety of the freeway Projects in question. Neither party advocates for this position, and we conclude that this position is foreclosed by applicable case law. Second, the "structure" in question could be the Interchange, in its entirety. Claimants advocate for this position. Third, the "structure" in question could be the individual component parts of the Interchange that are alleged to have affected Claimants' visibility. UDOT advocates for this position. We find Claimants' position most persuasive.

¶29    The "structure" in question cannot be the entirety of the Projects. This possibility has already been rejected by our

(…continued)
severance damages, and did not endeavor to itemize or individually value each part of their claimed severance damages (such as, for instance, loss of visibility solely due to the presence of the northbound on-ramp). UDOT therefore takes the position that, even though Claimants would be theoretically entitled to recover severance damages for loss of visibility caused by the northbound I-15 on-ramp, Claimants' specific evidence for this item of severance damages was insufficient.

supreme court. In *State v. Harvey Real Estate*, 2002 UT 107, 57 P.3d 1088, the court stated that severance damages were available for "damages caused by the construction of the improvement made on the severed property," and emphasized that severance damages cannot include "damages caused by other facets of the construction project." *Id.* ¶ 10; *see also id.* (noting that the court would not allow a landowner to "present evidence of all damages conceivably stemming from" a "multi-mile-length road construction project," and certainly not "those damages attributable to construction occurring miles away"). Likewise, in *Ivers*, the court refused to allow an award of severance damages caused by the loss of view resulting from the construction of a raised highway, when the land taken from the claimant was used only for construction of a small portion of a frontage road that, while inarguably part of the same overall construction project, was itself separate from the raised highway. *See Ivers*, 2007 UT 19, ¶¶ 1, 17 (stating that the claimant's land "was condemned as part of a single project to build a structure that would impair the view from the remaining property, but in which that structure was not built on the severed land"). Thus, the "structure" in question must be defined more narrowly than by reference to the entire multi-mile Projects constructed here.

¶30 While reference to the entirety of the two multi-mile Projects is far too broad, we perceive UDOT's position as too narrow. UDOT asserts that the "structure" in question is not the Interchange in its entirety but, rather, its specific individual components—for instance, the raised overpass, the raised northbound on-ramp, new retaining walls and sound walls— that Claimants assert impair the Shopping Center's visibility. UDOT concedes that at least a portion of the northbound on-ramp was built on Claimants' property, and therefore makes at least a theoretical concession that Claimants would be entitled to severance damages resulting from loss of visibility caused directly by the presence of the new northbound on-ramp. But UDOT maintains that it should not have to pay severance damages for loss of visibility caused by any other component

part of the Interchange, because none of the other parts of the Interchange were even partially constructed on Claimants' land.

¶31    We disagree, because we view the Interchange as one interconnected structure. Each part of the Interchange has some effect on the others, all stemming from UDOT's choice of a "diverging diamond" design. That design choice required a raised and widened freeway overpass, as well as raised on- and off-ramps. The raised on- and off-ramps, in turn, required new and higher retaining walls and slope supports. It seems to us unduly artificial to require a condemnation claimant to break a freeway interchange into component parts for the purpose of proving a claim to severance damages.[8] We also wonder whether we could, on any principled basis, halt the sub-dividing process once it begins.[9]

---

8. If the structure in question were a building instead of a freeway interchange, the analysis would be clearer. It would make little sense to say that a claimant could recover severance damages for loss of visibility occasioned by a single part or feature of a building (say, a wing of the building, or an awning, column, or steeple) but could not recover severance damages for loss of visibility occasioned by other parts of that same building. While we concede that a building is perhaps more clearly one contiguous "thing" than a freeway interchange is, we cannot conceive of any principled basis upon which to distinguish the two scenarios.

9. As noted, UDOT conceded that Claimants have at least a theoretical entitlement to severance damages caused by loss of visibility related to the northbound on-ramp. But absent that concession, UDOT could potentially have argued that only the dirt slope support was actually constructed on Claimants' property, while the actual retaining wall and the rest of the on-ramp were not. If we permit UDOT to subdivide the Interchange down into its component parts (e.g., bridges and on-ramps), we

(continued…)

¶32    We are also guided by our supreme court's language in *Ivers* and *Admiral Beverage*. In those cases, it appears that the court thought of the "structure" in broader terms than UDOT now advocates. For instance, in *Ivers* and *Admiral Beverage*, the court referred to the structure in question as simply "the raised highway" or "the I-15 freeway," rather than to individual on-ramps or retaining walls. *See Ivers*, 2007 UT 19, ¶¶ 1, 3; *Admiral Beverage*, 2011 UT 62, ¶ 2.

¶33    Moreover, in *Admiral Beverage*, the supreme court overruled its own previous holding, outlined in *Ivers*, that loss of visibility damages were not recoverable as part of severance damages. *See Admiral Beverage*, 2011 UT 62, ¶¶ 17–19. The court did so, in part, because it deemed the *Ivers* rule "unworkable in practice" because of the difficulty encountered by appraisers who were asked, under the *Ivers* rule, to "assign specific values" to loss of visibility damages as part of an overall severance damages analysis. *Id.* ¶ 39; *see also id.* ¶ 41 (noting that the *Ivers* rule required appraisers to "resort to rank speculation when attempting to exclude the loss of visibility from fair market value"). The court applied a holistic approach to severance damages, determining that such damages are computed by simply "comparing the market value of the portion of property not taken with its market value before the taking." *Id.* ¶ 30; *see also City of Hildale v. Cooke*, 2001 UT 56, ¶ 20, 28 P.3d 697 (noting the "cardinal and well-recognized rule" that severance damages consist of "the difference in market value of the property before and after the taking" (citation and internal quotation marks omitted)). It would be inconsistent with this overall approach to require Claimants' appraisers to engage in a similarly speculative effort to isolate the severance damages caused by

---

(…continued)
are aware of no principle that would prevent condemnors from subdividing each component part into its own respective sub-parts (e.g., retaining walls, slope supports).

one component part of a freeway interchange separate from those severance damages caused by another.

¶34    Accordingly, we view the "structure" in question as the Interchange, rather than as the Projects or as the Interchange's individual component parts.

3.

¶35    Finally, after answering the first two questions, we must determine whether, as a factual matter, the structure (as we have defined it) was at least partially constructed upon the taken parcel. It should be evident by now that it was.

¶36    As described above, one extremely small part (the slope supporting a retaining wall that is part of the northbound I-15 on-ramp) of the Interchange was built on land taken from Claimants. Under these circumstances, Claimants are entitled to recover severance damages caused by loss of visibility resulting from construction of the entire Interchange.[10] The structure in

10. We are aware that, in some cases, it may be difficult to determine where an "interchange" begins and ends. In this case, however, as far as we are aware, all of the items that were described as part of the cause of Claimants' severance damages for loss of visibility (e.g., the raised freeway overpass, the northbound I-15 on-ramp, the new retaining walls) are unquestionably part of the Interchange. However, we note that, at oral argument and at one point in its reply brief, UDOT made some mention of "sound walls" that it claimed were quite a distance away from the Shopping Center. This argument was not well-developed in UDOT's briefing, and as a result we are not certain exactly which "sound walls" UDOT is referring to or where they are located, or whether UDOT is even attempting to argue that the sound walls in question are not part of the Interchange. We note simply that we consider any such claim on UDOT's part—that some of the items included as causes of

(continued…)

question—the Interchange—was at least partially built on land taken from Claimants, and these facts entitle Claimants to take advantage of the presumption that the severance damages they suffered as a result of the construction of the Interchange were incurred "by reason of the severance." *See* Utah Code Ann. § 78B-6-511(2) (providing that recoverable severance damages consist of those damages incurred "by reason of [the remaining parcel's] severance from the portion sought to be condemned"); *see also Ivers*, 2007 UT 19, ¶ 20 (stating that "when the condemned land is used for the construction of the view-impairing structure, the damage to the remaining property is clearly caused by the severance").

¶37    Thus, with regard to their claims for severance damages for loss of visibility, Claimants are able to demonstrate the requisite causal link through the first method—by showing that the view-impairing structure (the Interchange) was at least partially constructed on their former land. With regard to those damages claims, it is not necessary for Claimants to prove that the taken parcels were "essential" to the Projects as a whole. The trial court therefore did not err by allowing Claimants' suit for severance damages for loss of visibility to proceed to a jury trial.

B.    Severance Damages for Loss of the Right-Out Exit

¶38    This does not end our analysis, however, because there is another component of severance damages to which Claimants assert entitlement: severance damages associated with loss of the right-out exit onto Main Street. At oral argument, UDOT conceded that Claimants were theoretically entitled to recovery of this component of severance damages, but maintained that Claimants had not presented sufficient evidence of damages with regard to that claim. We find UDOT's arguments

---

(…continued)
Claimants' loss of visibility damages may not be part of the Interchange—to be inadequately briefed and developed.

unpersuasive, and agree with Claimants that they presented sufficient evidence of their claimed severance damages.

¶39 "[T]he proper measurement of severance damages is determined by comparing the market value of the portion of property not taken with its market value before the taking." *See Admiral Beverage*, 2011 UT 62, ¶ 30. Prior to *Admiral Beverage*, under the rule set out in *Ivers* under which claimants could recover for loss of view but not for loss of visibility, *see Ivers*, 2007 UT 19, ¶¶ 11–15, appraisers could not simply state their conclusions in such straightforward before-and-after terms. Instead, they had to attempt to "assign specific values to [some] of the numerous factors affecting market value, including any decrease in value due to loss of visibility." *See Admiral Beverage*, 2011 UT 62, ¶ 39. Our supreme court noted that this task was "extreme[ly] difficult[], if not impossibl[e]," for appraisers to accomplish without resorting to "rank speculation." *Id.* ¶ 41. Partially for this reason, our supreme court overruled its holding in *Ivers* that condemnation claimants could not recover severance damages for loss of visibility. Ever since *Admiral Beverage*, condemnation claimants have been able to assert claims to a full complement of severance damages, measured using a simple before-and-after metric, and limited only by general notions of causation and evidentiary proof.

¶40 Thus, there is no requirement, in *Admiral Beverage* or in any other case of which we are aware, that Claimants must present their severance damages on a line-item basis, including a discrete value for, specifically, damages suffered by virtue of the loss of the right-out exit.[11] Claimants are free to present their

---

11. There is a statutory mandate that, in condemnation cases, "as far as practicable compensation shall be assessed for each source of damages separately." *See* Utah Code Ann. § 78B-6-511 (LexisNexis 2012). UDOT makes passing mention of this statute in its brief, but makes no argument that this statute should be

(continued…)

severance damages evidence in a more general way, by presenting to the factfinder evidence of what the property was worth prior to the taking, and what it is worth after the taking.[12]

¶41    In this case, Claimants did just that, and we find no legal infirmity in their efforts. Appraiser concluded that Claimants' remaining property was worth approximately $2.3 million less after the Interchange was built than it was before construction began. Appraiser testified that there were two main factors that contributed to the property's diminution in value—loss of

_____

(…continued)
read in a manner that would put it at odds with our supreme court's analysis in *Admiral Beverage*.

12. Despite the difficulty of the endeavor, as described in *Admiral Beverage*, 2011 UT 62, ¶¶ 38–39, it may be true that, in some cases and under some factual circumstances, appraisers would be able to itemize and individually value the various factors that comprise the total diminution in value. Where this is possible, and where appraisers are comfortable making the attempt, claimants may wish to consider presenting such evidence, since stating diminution in value only in general terms carries some risk. For instance, if we had reached the opposite result in this case with regard to Claimants' entitlement to severance damages for loss of visibility for the entire Interchange, and concluded instead that Claimants were entitled to severance damages only for those two items conceded by UDOT (namely, (a) loss of the right-out exit and (b) loss of visibility related to the northbound I-15 on-ramp), we would have had to confront the question of whether to dismiss those claims for lack of proof, since no witness at trial offered any actual damages figure for the jury to consider on either of these two specific items, or whether to remand the case for a new trial on damages. Claimants dodged that bullet here, however, due to our conclusion that Claimants are entitled to recovery of all of the categories of severance damages for which they sought compensation at trial.

visibility and loss of the right-out exit. Appraiser's failure to provide specific values for these individual components of loss, in particular for loss in value caused by the loss of the right-out exit alone, does not render his testimony infirm or inadmissible, at least not in this case.

CONCLUSION

¶42    Even though only a small portion of the enormous Interchange was actually built on the land UDOT took from Claimants, that small portion enables Claimants to take advantage of a much easier pathway to prove a causal link between the taking and their claimed damages. Because the Interchange was at least partially built on the taken property, a causal link between the taking and Claimants' severance damages for loss of visibility is presumed. Claimants do not need to prove that the taking of their parcels was "essential" to the Projects as a whole.

¶43    Claimants are likewise entitled to recover severance damages for loss of the right-out exit onto Main Street. UDOT concedes that Claimants are theoretically entitled to these damages. Because we conclude that Claimants are entitled to recover each of the categories of severance damages at issue in this appeal, it necessarily follows that their damages evidence, presented merely in a before-and-after manner, was sufficient on the facts of this case.

¶44    Affirmed.

_____